## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kyle Jerome Dalen, individually and on behalf of all others similarly situated, | Case No. 23-cv-1877 (ECT/ECW) |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| Jodi Harpstead, Commissioner of the Minnesota Department of Human Services, *in her individual and official capacities*, | |
| Defendant. | |

## <u>INTRODUCTION</u>

Defendant's motion to dismiss Plaintiff's First Amended Complaint ("FAC") should be denied for several reasons. First, Plaintiff Kyle Jerome Dalen, who brought this claim individually and for a purported class, has standing to sue because he alleges violations of his constitutional right under both the old statute and the statute as amended. Second, Plaintiff has sufficiently alleged that the amended statute should be found to be unconstitutionally vague as it fails to give proper notice as to the meaning of the statute and infringes on the separation of powers by allowing the Commissioner to make determinations that should be decided by a court or the legislature. Likewise, Plaintiff has sufficiently alleged all of his constitutional claims and tort claims. Defendant cannot escape liability by claiming immunity, because Plaintiff adequately alleges that she was personally involved in the alleged constitutional violations of clearly established rights.

Accordingly, for the reasons discussed below, Plaintiff respectfully requests that Defendant's motion to dismiss be denied.

## <u>BACKGROUND</u>

The Minnesota Commitment and Treatment Act (the "MCTA") governs the procedures and standards for civil commitment of criminal defendants pursuant to Rule 20 of the Minnesota Rules of Criminal Procedure. When a judge orders a defendant committed under certain provisions of Rule 20, the Commitment Act requires that the defendant be committed to the custody of Defendant Commissioner of the Department of Human Services ("Defendant," "Commissioner," or "DHS").

Until recently, the MCTA required the Commissioner to admit such individuals to a state-operated treatment program within 48 hours of the commitment order. Minn. Stat. § 253B.10, subd. 1(b) (2022); *see Swope v. Harpstead,* Case No. 70-CV-22-13153, Dkt. No. 109, Findings of Fact, Conclusions of Law, and Order Denying Demurrer, and Peremptory Writ of Mandamus, at 9–14 (Scott County, Feb. 22, 2023); *Ly v. Harpstead,* Case No. 70-CV-22-13781, Dkt. No. 65, Findings of Fact, Conclusions of Law and Order Denying Demurrer, Ordering a Peremptory Writ of Mandamus, and Judgment for Petitioner, at 12–16 (Scott County, Dec. 21, 2022).[1] After years of neglecting this statutory duty—leaving individuals with severe mental health symptoms to languish in jails for weeks or months despite having not been convicted by a jury—the Commissioner

---

[1] Copies of the referenced orders in *Ly v. Harpstead* and *Swope v. Harpstead* are attached to the Declaration of Daniel E. Gustafson as **Exhibit A** and **Exhibit B** respectively.

successfully lobbied the Minnesota Legislature to amend the Commitment Act to effectively nullify the 48-hour law.

As amended, the statute now provides that individuals committed by a court "must be admitted to a state-operated treatment program within 48 hours of the Office of Medical Director . . . determining that a medically appropriate bed is available" (the "Amended Act"). Minn. Stat. § 253B.10, subd. 1(e). By tolling the 48-hour clock until a "medically appropriate bed is available," the amendment removes any timeline by which Defendant must transfer individuals committed to her custody out of jails and into treatment. Given Defendant's long and consistent history of neglecting persons suffering from severe mental illness and leaving them in Minnesota jails for unreasonably long periods of time, a statutory amendment granting her unfettered discretion as to the timing of every transfer effectively legalizes extrajudicial incarceration and punishment of highly vulnerable, and legally innocent, members of the community.

The Commissioner violated Plaintiff's rights under the pre-amendment MCTA, and the Amended Act is a continuing unconstitutional infringement on those rights. Plaintiff brought this class action to address the serious constitutional violations under the old 48-hour law and the new Amended Act.

## <u>LEGAL STANDARD</u>

On a motion to dismiss, courts must accept the allegations as true and draw all reasonable inferences in the plaintiffs' favor. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014). A complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). This standard "do[es] not require heightened fact pleading of specifics." *Id.* A court should construe a complaint liberally and in the light most favorable to the plaintiff. *See Luney v. SGS Auto. Servs., Inc.*, 432 F.3d 866, 867 (8th Cir. 2005). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008) (quoting *Twombly*, 550 U.S. at 544).

## ARGUMENT

## I.   PLAINTIFF HAS STANDING TO CHALLENGE THE AMENDED ACT

To demonstrate Article III standing, a plaintiff must establish (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992). The injury-in-fact element of standing requires an injury to be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotations omitted).

Defendant suggests that Plaintiff lacks standing because the Amended Act has had "no discernable effect on Plaintiff's transfer." [Mem., ECF No. 13 at 6]. This argument, however, relies on Defendant's preferred conclusion: that the amendment did not change the law but clarified it. Defendant argues that, despite the clear language of the statute, the pre-amendment 48-hour law only required Defendant to transfer individuals within 48 hours of determining that a medically appropriate bed was available. This assertion has not

4

only been sharply rejected by every court to have considered the matter,[2] but also publicly

disclaimed by Minnesota Attorney General Keith Ellison—Defendant's own counsel.[3]

The crux of Plaintiff's lawsuit is that his constitutional rights were violated by

Defendant's failure to transfer him timely from jail to a state-operated treatment program

under the old 48-hour law and the Amended Act. [First Am. Class Action Compl. ("FAC"),

ECF No. 10, at ¶¶ 9, 38–41; 43–50; 54–58; 63–65; 69–71; 75–80; 82–84].[4] Plaintiff further

alleges that Defendant—unwilling to effectuate Plaintiff's and other class members' rights

under existing law—caused there to be an amendment to the MTCA, further injuring him

and the putative class. [*Id.* at ¶ 11].

Defendant insists Plaintiff "was not transferred to a treatment facility without

consideration of its capacity in this period any more than he was after the Amended Act

went into effect." [ECF No. 13 at 6–7]. In other words, Defendant contends that Plaintiff

---

[2] *E.g.*, *Ly v. Harpstead*, **Exhibit A** at 9–10 ("The Commissioner's argument that the timeline begins at the time a 'medically appropriate bed' becomes available is unpersuasive, self-serving, and disingenuous. . . . and wholly the result of the increasing pressure on the Commissioner to comply with the law."); *Swope v. Harpstead*, **Exhibit B** at 17 ("[T]hat 48 hours should begin when a 'medically appropriate bed becomes available' is self-serving, would result in indefinite incarceration at DHS's discretion, and has little to do with how the law actually reads.").

[3] *SF2934 - Public Testimony on the Human Services Finance Omnibus Bills, before the Senate Conference Committee*, 93d Leg. Sess., at 7:42 https://mnsenate.granicus.com/player/clip/11554?view_id=1&redirect=true&h=a0c8d980f3d78166ee14e8d0e6b1895d (statements by Keith Ellison in support of bill that would become the Amended Act).

[4] Defendants' Motion appears to cite to Plaintiff's' original Class Action Complaint (ECF No. 1) and not to the FAC. *See, e.g.*, [Mem., ECF No. 13 at 2 (citing [FAC at ¶ 15] for the proposition that Plaintiff brings this action on behalf of a class of people who were "detained in any jail or prison for more than 48 hours after having been ordered civilly committed")]. Plaintiff's citations refer to the numbered paragraphs in the FAC.

was treated the same (i.e., left in jail instead of being transferred) before and after the amendment of the MCTA. Under both versions of the statute, Plaintiff alleges constitutional violations relating to his continued incarceration by Defendant that resulted in damages. Therefore, Plaintiff has standing.

## II.     PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE ADEQUATELY PLEAD

### A.     Plaintiff Sufficiently Alleges that the Amended Act is Void for Vagueness.

#### 1.     The Court Should Apply the Heightened Standard Given the Deprivations of Freedom at Issue.

"Vague statutes are prohibited under the due process clause of the fourteenth amendment." *Hard Times Café, Inc. v. City of Minneapolis*, 625 N.W.2d 165, 171 (Minn. App. 2001) (quotation omitted). "A statute is void for vagueness if it defines an act in a manner that encourages arbitrary and discriminatory enforcement or if the law is so indefinite that people must guess at its meaning." *In re On-Sale Liquor License, Class B.*, 763 N.W.2d 359, 366 (Minn. Ct. App. 2009); *see United States v. Washam*, 312 F.3d 926, 931 (8th Cir. 2002) ("Congress must provide minimal requirements to guide law enforcement in order to prevent police officers, prosecutors, and juries from pursuing their personal predilections.").

Defendant does not dispute that the void-for-vagueness doctrine applies to civil regulations. [Mem., ECF No. 13 at 8]. Defendant, however, invites this Court to apply less scrutiny in this case because the statute at issue is not criminal. [*Id.*] However, the Supreme Court in *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) recognized that the most

exacting vagueness standard should apply to some challenges to non-criminal statutes. *Id.* The *Sessions* Court looked back to its decision in *Jordan v. De George*, 341 U.S. 223, 229 (1951), where the Supreme Court considered a statute making an alien deportable for a "crime involving moral turpitude" under the vagueness doctrine and rejected the government's argument that the clause should be considered under the "less searching" form of the void-for-vagueness doctrine because the regulation at hand was a civil, not a criminal penalty. *Sessions*, 138 S. Ct. at 1213 (*citing Jordan*, 341 U.S. at 231. However, as the *Sessions* Court recognized, the *Jordan* Court examined the clause with "the most exacting vagueness standard" because deportation is a "drastic measure." *Sessions*, 138 S. Ct. at 1213 (citing *Jordan*, 341 U.S. at 231).

Here, while the 48-hour law is a civil regulation, it also results in a "drastic measure"—incarceration without a conviction. The Amended Act, similar to the "civil penalty" in *Jordan*, carries with it the potentially *indefinite* incarceration of mentally ill individuals. Accordingly, the Court should examine the Amended Act with a similar level of exactitude. Indeed, Justice Gorsuch, in his concurring opinion in *Sessions*, recognizes that "[o]urs is a world filled with more and more civil laws bearing more and more extravagant punishments. Today's "civil" penalties include . . . the power to commit persons against their will indefinitely." *Sessions*, 138 S. Ct. at 1229 (concurring opinion). He continued: "Given all this any suggestion that criminal cases warrant a heightened standard of review does more to persuade me that the criminal standard should be set above our precedent's current threshold than to suggest the civil standard should be buried below it." *Id.* Given that Amended Act grants DHS the authority to hold individuals without

criminal convictions in jail without needed treatment indefinitely, until such time as DHS determines is "appropriate," the heightened void-for-vagueness standard should apply.

### 2. The Amended Act Fails to Give Fair Notice of What Conduct Is Required by the Statute.

The Supreme Court in *Sessions* recognized that "the void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Id.* 138 S. Ct. at 1212 (citing *Papachristou v. Jacksonvill*, 405 U.S. 156, 162 (1972)). "A statute is unconstitutionally vague . . . if it 'fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the statute' . . . ." *LaRouche v. Sheehan*, 591 F. Supp. 917, 920 (D. Md. 1984) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1964)). Here, the statute at issue does not proscribe any individual's conduct. Rather, it requires conduct from the government.

The amendment left the original 48-hour law language in section 253B.10, subdivision 1, subsection (b) intact, but added the following subsection (e): "Patients described in paragraph (b) must be admitted to a state-operated treatment program within 48 hours of the Office of Medical Director, under 246.018, or a designee determining that a medically appropriate bed is available." Minn. Stat. § 253B.10, subd. 1(e). Nowhere in this section, nor the remainder of the MCTA, is the Office of Medical Director given any direction or guidance as to the determination it is supposed to make under the Amended Act. "Medically appropriate" and "available" are defined or outlined, nor is there any guidance as to when or how the Office of Medical Director attempts to make its determination. Therefore, the determination that starts the clock for the Commissioner's

required conduct is made purely on subjective interpretation and whim of the Office of Medical Director—which is within DHS and whose director is appointed and paid by the Commissioner. Minn. Stat. § 246.018, subds. 1–2.

The Amended Act purports to protect citizens, but fails to provide any meaningful notice as to when or how any individual citizen becomes entitled to that protection, and consequently deprives the courts of any way of testing whether an individual was denied that protection. For example, whether the Office of Medical Director reviews the availability and medical appropriateness of beds once every day, week, or year—all would be equally compliant with the Amended Act. Likewise, the Commissioner could refuse to admit someone to treatment indefinitely on the ground that no "medically appropriate" bed is "available," and a court would be unable to test that claim because there is no guidance as to what constitutes "medically appropriate" or "available."

Defendants cite other places within Minnesota statutes where the phrase "medically appropriate" is used. [Mem., ECF No. 13 at 10]. But whether "a health carrier's telemonitoring service is 'medically appropriate'" does not implicate an individual's fundamental rights in the same way as prolonged detention in a county jail. [*Id.* (quoting Minn. Stat. §§ 62A.673A.673, subd. 7(1))]; *see Sessions*, 138 S. Ct. at 1212. What may be an acceptable amount of vagueness in the former is impermissible in the latter.

Finally, Defendants cite involuntary treatment cases where courts have purportedly enforced statutes which contain the words "medically appropriate." [Mem. ECF No. 13 at 10–11]. But each of these cases involved statutes which permit forceable medication only if the government can meet several objective and subjective criteria, only one of which is

that the treatment be "medically appropriate." *See, E.g.*, *Sell v. United States*, 539 U.S. 166, 181 (2003) (finding that a defendant is deprived of due process rights when they are involuntarily medicated unless the government can prove (1) an important government interest; (2) that involuntarily medication will significantly further those state interests; (3) the medication is necessary to further those interests; and (4) the administration of drugs is medically appropriate). Even within those determinations, the courts are guided by discrete criteria and caselaw in finding whether a treatment is "medically appropriate." *See, e.g.*, *United States v. Evans*, 404 F.3d 227, 242 (4th Cir. 2005) ("[T]reatment is 'medically appropriate' if it is 'in the patient's best medical interest in light of his medical condition'" which requires the government to, *inter alia*, "provide the estimated time the proposed treatment plan will take to restore the defendant's competence and the criteria it will apply when deciding when to discontinue the treatment," as well as describe probable side effects) (citing *Sell*, 539 U.S. at 181)). Defendant, on the other hand, has unfettered discretion to determine when, if ever, a medically appropriate bed becomes available. Because the alternative to finding a bed for Plaintiff and class members is indefinite detention, the Court ought to apply an exacting standard for vagueness and find that the Amended Act is unconstitutionally vague.

### 3. The Amended Act Fails to Guard Against Arbitrary Enforcement.

The Supreme Court in *Sessions* noted that the void-for-vagueness doctrine also "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the action of policy officers, prosecutors, juries and judges."

*Sessions*, 138 S. Ct. at 1313 (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)). A statute may be void for vagueness if it "permit[s] public officials to exercise unreviewable discretion in their enforcement of the statute because of a lack of standards." *Duke v. Coonnell*, 790 F. Supp. 50, 54 (D. Conn. 1992) (citing *Hynes v. Mayor of Oradell*, 425 U.S. 610, 621–22 (1976)). The Minnesota Supreme Court found procedural due process violations in the application of Minn. Stat. § 169A.63, recognizing that "[t]he Supreme Court has long cautioned against the constitutional vagaries of statutes that 'provide such minimal guidelines' so as to permit 'a standardless sweep [that] allows . . . prosecutors . . . to pursue their personal predilections.'" *Olson v. One 1999 Lexus MN License Plate No. 851LDV Vin: JT6Hf10U6X0079461*, 924 N.W.2d 594, 614 (Minn. 2019) (quoting *Kolender*, 461 U.S. at 358) ("Due process is not satisfied by a rule that allows a person's property right to turn on the whim of a prosecutor."); *accord Sessions*, 138 S. Ct. at 1214; *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162–163 (1972); *Kunz v. New York*, 340 U.S. 290, 294 (1951).

Here, as noted above, this statute requires the Commissioner to act to protect individuals' rights, but ultimately allows DHS to unilaterally determine when it does so act and sets no standards by which DHS must make that determination. Because the amended statute sets no guidance on what constitutes a "medically appropriate" or "available" bed, nor how those determinations are to be made, it renders judicial accounting of the statute impossible. *See Sessions*, 138 S. Ct. at 1214 (noting that the Court had previously recognized that a particular statute "provided no guidance, rendering judicial accounts of

the 'ordinary case' wholly 'speculative'" (quoting *Johnson v. United States*, 576 U.S. 591, 597 (2015)).

Defendant may argue that, even under this scheme, committed individuals have more rights with the Amended Act than without. But the practical result of the Amended Act grants the Commissioner exactly what she has sought for a long time: unlimited discretion as to when to admit individuals from jails and into treatment with no oversight or accountability for the exercise of that discretion. This is precisely the sort of indefinite law "that encourages arbitrary and discriminatory enforcement." *In re On-Sale Liquor License*, 763 N.W.2d at 366; *see Kolender*, 461 U.S. at 358 ("[T]he more important aspect of vagueness doctrine is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." (quotation omitted)). For this reason, too, the Amended Act is void for vagueness.

**B.      Plaintiff Sufficiently Alleges that the Amended Act Infringes on Judicial Power.**

Article 3, Section 1 of the Minnesota Constitution states that "[n]o person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution." *See also Minnesota Auto. Dealers Ass'n v. Minnesota Pollution Control Agency*, 986 N.W.2d 225, 231 (Minn. Ct. App. 2023), *review denied* (May 16, 2023). In Minnesota, the nondelegation doctrine is not violated "so long as the law furnishes a reasonably clear policy or standard of action which controls and guides the administrative

officers in ascertaining the operative facts to which the law applies." *Id*. at 231–32 (quotation omitted).

The Amended Act is unconstitutional because it violates separation of powers by usurping a judicial function and granting it to DHS—a department of the executive branch. Under the old statute, the Commissioner had to move a committed individual within 48 hours of a court's order for commitment. *See Ly v. Harpstead*, **Exhibit A**, at 8–9. And, although the Commissioner frequently ignored courts' commitment orders and the statute requiring her to comply with those orders, the separation of power was at least clear. Under the Amended Act, the Court no longer has a say in when an incarcerated individual should be moved. The Commissioner now can keep someone in a jail until such time as the Commissioner decides to move them. Defendant attempts to skirt this argument by saying that all of Defendant's actions are based on medical treatment, and such decisions "are outside even the committing court." [Mem., ECF No. 13 at 12].

First, as described more fully *infra*, Defendant cannot launder her actions by labeling them medical decisions. The Commissioner's refusal to transfer Plaintiff (and many like him) to a medical treatment facility for weeks or months cannot constitute a "medical decision" and clearly demonstrates that Defendant's actions were not actually based on professional judgment. *See Youngberg v. Romeo*, 457 U.S. 307 (1982). But the Amended Act does far more than grant Defendant sole authority to determine when a medically appropriate bed is available, it concomitantly grants Defendant unbridled authority to continue to incarcerate individuals for as long as she decides without judicial

warrant and without a criminal conviction. Such an action goes beyond garden-variety medical decisions and clearly implicates judicial function.

Second, the Amended Act is unconstitutional because it does not furnish a reasonably clear policy or standard of action which controls or guides its application of the law. In *Lee v. Delmont*, the Minnesota Supreme Court held that "[a]lthough discretion to determine when and upon whom a law shall take effect may not be delegated, the legislature may confer upon a board or commission a discretionary power to ascertain . . . some fact or circumstance upon which the law [depends]." 36 N.W. 2d 530, 538 (Minn. 1949. Discretionary power delegated to a board or commission "is not legislative" if the law doing so

> furnishes a reasonably clear policy or standard of action which controls and guides the administrative officers in ascertaining the operative facts to which the law applies, so that the law takes effect upon these facts by virtue of its own terms, and not according to the whim or caprice of the administrative officers.

*Id.* at 538–39. As described above, the Amended Act starts the clock for the Commissioners' required action upon DHS making a particular determination, but it contains no policy or standard of action by which DHS ascertains the operative facts or makes that determination. Thus, the Amended Act should be declared unconstitutional.

Finally, the Amended Act usurps from the judicial branch the power to control criminal and commitment proceedings before it. When issuing commitment orders, some Minnesota judges have included deadlines for the committee's admission to treatment or examination. The previous 48-hour law only set a maximum amount of time DHS could delay transporting defendants to a treatment facility. By not only nullifying that provision,

14

but affirmatively stating that the Commissioner need only admit after her department alone makes a certain determination, the Amended Act empowers a department of the executive branch to hijack certain judicial proceedings without limit.

### C.   Defendant Violated Plaintiff's Due Process Rights.

#### 1.   Plaintiff Sufficiently Alleges Deliberate Indifference.

To make out a violation of the Eighth Amendment prohibition against cruel and unusual punishment arising from inadequate medical attention, an inmate must show "deliberate indifference" to a "serious illness or injury." *Senty-Haugen v. Goodno*, 462 F.3d 876, 889 (8th Cir. 2006). Courts apply the same standard to individuals who are involuntarily committed. *Mead v. Palmer*, 794 F.3d 932, 936 (8th Cir. 2015). A plaintiff must demonstrate (1) that he had an objectively severe medical need, and (2) that prison officials knew of, but deliberately disregarded that need. *Senty-Haugen*, 462 F.3d at 889.

Defendant begins by trying to raise the bar on a motion to dismiss, suggesting that Plaintiff must plead that he was experiencing a "medical crisis" and actually provide evidence that he was in fact "harmed as a result." [Mem., ECF No. 13 at 14 (citing *Moots v. Lombardi*, 453 F.3d 1020, 1023 (8th Cir. 2006))]. Of course, this is not the standard for a motion to dismiss. *Twombly*, 550 U.S. at 570. Moreover, *Moots* was decided on summary judgment with the benefit of a full record. Developing a record in this case, as was done in *Moots*, is especially appropriate because Plaintiff is still evaluating the extent to which his extended stay in jail before his transfer impacted and exacerbated his mental and physical illnesses.

On a motion to dismiss, Plaintiff needs to *plausibly allege* that he had an objectively serious medical need that Defendant was subjectively aware of. Plaintiff alleges just that. [FAC at ¶ 3]. ("Plaintiff suffers from antisocial personality disorder, narcissistic personality disorder, and chemical dependency."); 13 ("the 48-hour law ensured that defendants with mental or cognitive health needs to not suffer prolonged time periods in jail—where conditions and lack of treatment can worsen their symptoms and present a serious risk of harm to them, other detainees, or staff."); 56 (describing Plaintiffs' conditions as including "the complete lack of mental health treatment and *de minimus* physical health treatment"); 77 ("Plaintiffs and Class members suffered injuries while held in jail because they were not given necessary care and treatment and because the environment of jail is counter-therapeutic."); 78 ("…Defendant was aware that mentally ill individuals receive *de minimus*, if any, mental health treatment and care while detained in jails and prisons."); and 38 ("Defendant actually knew about these needs because she receives court orders placing Plaintiff and Class members in her custody for examination and treatment of those needs."). Nothing further is required on motion to dismiss.[5]

### 2.   Plaintiff Sufficiently Alleges Punitive Conditions of Confinement.

Civilly committed persons, like pretrial detainees, cannot be subjected to conditions "that amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Beaulieu v.*

---

[5] Defendant includes in a footnote the statement "Plaintiff does not allege that Defendant delayed his transfer to AMRTC through neglect or animus." [Mem., ECF No. 13 at n.10]. Plaintiff explicitly alleges that Defendant was, at the very least, negligent. *See, e.g.*, [FAC at ¶¶ 76–80].

*Ludeman*, 690 F.3d 1017, 1045 (8th Cir. 2012) ("[C]ivilly-committed persons, like pretrial detainees, are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment." (quotation omitted)); *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (noting that those confined for civil purposes "may not be punished at all"). Whether the particular restrictions and conditions accompanying pretrial detention are unconstitutionally punitive turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose. *Bell*, 441 U.S. at 538. Where a defendant posits an alternative purpose to which the restriction may rationally be connected, a detainee can show punitiveness by demonstrating that their conditions of confinement "appear excessive in relation" to such alternative purpose. *Karsjens v. Lourey*, 988 F.3d 1047, 1054 (8th Cir. 2021) (quoting *Bell*, 441 U.S. at 538). As the Eighth Circuit has held, when considering whether conditions are unconstitutionally punitive, the Court must consider the totality of the circumstances. *Karsjens*, 988 F.3d at 1054 (citing *Morris v. Zefferi*, 601 F.3d 805 (8th Cir. 2010)). In *Morris*, this Court noted that "[w]hen considered separately and in isolation, Morris's allegations of unsanitary conditions of the cage, the degree of discomfort experienced by Morris, or the humiliation suffered by Morris may not appear to state a constitutional violation. But Morris did not experience these conditions in isolation." 601 F.3d at 810. Finally, the time that an individual is exposed to harsh conditions is "a critical factor in [the] analysis [of punitive conditions]," and "[c]onditions such as a filthy cell that may be tolerable for a few days are intolerably cruel for weeks or months." *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996).

First, Defendant relies on *Butler v. Fletcher*, 465 F.3d 340 (8th Cir. 2006), to support her motion to dismiss, but the *Butler* case is distinguishable. The plaintiff in *Butler* sued the sheriff presiding over the prison in which he was incarcerated for failing to take measures to prevent inmates from tuberculosis. *Id.* at 340–41. *On summary judgment*, the court found that plaintiff did not present enough evidence to demonstrate that the sheriff acted with deliberate indifference to plaintiff's health risks. *Id.* at 345–56. On a motion to dismiss, however, Plaintiff does not need to present any evidence—rather he needs to *plausibly allege* that Defendant infringed on his Fourteenth Amendment rights.

Additionally, in *Ingram v. Cole Cnty.*, the Eighth Circuit expressly chose not to adopt *Butler*'s reasoning on the applicability of the deliberate indifference standard, concluding first that "*Butler* was a medical-care case, so its statement about food, clothing, and shelter claims is dictum . . . Second, our cases often apply *Bell*'s punishment standard to prison-conditions claims . . . And third, the Supreme Court recently reaffirmed . . . that *Bell* remains the standard for evaluating prison conditions for pretrial detainees." 846 F.3d 282, 286–87 (8th Cir. 2017), *vacated en banc*, 732 F. App'x 496 (8th Cir. 2018). Thus, because Plaintiff's FAC alleges conditions of confinement that go beyond just medical care, Plaintiff's claims must be evaluated under *Bell*.

Defendant wrongly asserts that "the [FAC] is, again, completely silent on the conditions of Plaintiff's confinement and no general lack of treatment or resulting specific harm to Plaintiff is alleged." [Mem., ECF No. 13 at 17]. But, as described above, this is far from the truth. *See, e.g.*, [FAC ¶¶ 3, 13, 45, 56, 77, 78]. Moreover, Defendant cannot seriously dispute that the physical conditions of Plaintiff's incarceration—identical to those

who have in fact been convicted of a crime and are incarcerated *as a means of punishment*—are not punitive. *See Means v. United States*, 961 F.2d 120, 121 (8th Cir. 1992) (finding that there were constitutional safeguards that prevented the defendant from being "punished by incarceration"); *see also Campbell v. McGruder*, 580 F.2d 521, 530 (D.C. Cir. 1978) ("Not only is pretrial detention itself indistinguishable from punishment . . . . [t]he very conditions of confinement are additional deprivations of liberty. They are also punishment."); *see also*, *Bell*, 441 U.S. 520, 569 (Marshall, J. *dissenting*) ("For in terms of the nature of the imposition and the impact on detainees, pretrial incarceration, although necessary to secure defendants' presence at trial, is essentially indistinguishable from punishment."); *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 73 F. Supp. 3d 1311, 1316 (W.D. Wash. 2014) ("[B]ecause jails are inherently punitive and not therapeutic institutions, the mental health of detainees further erodes with each additional day of wait time . . . ."); *Advoc. Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 623 (E.D. La. 2010) ("Here, by virtue of their detention in parish jails, the Incompetent Detainees who have been convicted of no crime are being held in conditions substantially similar to those designed to punish."). Defendant's only contention is that such punishment is related to a legitimate government goal.

On this point, Defendant asserts that there is a "government purpose to ensure [Plaintiff] is placed in a medically appropriate facility with the capacity to treat him." [Mem., ECF No. 13 at 18]. But this is at best misunderstanding the law. First, Defendant's self-identified "legitimate government goal" is to "provide proper care and treatment . . . to render further supervision unnecessary." [Mem., ECF No. 13 at 18 (citing Minn. Stat. §

19

253B.03, subd. 7)]. Even accepting this assertion on its face, Defendant's actions run *directly contrary* to the goal of providing proper care and treatment. In *Oregon Advocacy Center v. Mink*, the district court stated the obvious:

> *only a mental hospital* like OSH, *not a county jail*, can fulfill these purposes [of treatment for incompetent defendants]. Only OSH has the highly trained staff and other resources needed to identify and treat an incapacitated criminal defendant's mental illness. County jails are simply unable to provide restorative treatment, and the jails' disciplinary systems may exacerbate the defendants' mental illnesses.

322 F.3d 1101, 1122 (9th Cir. 2003) (emphasis added). Plaintiff clearly alleges that he was not given adequate treatment while in jail, and that his incarceration exacerbated his illnesses. *See, e.g.*, [FAC at ¶ 45 ("The conditions of county jails and state prisons are severely detrimental to the safety and wellbeing of individuals who suffer from disorders and dependencies like Plaintiff and Class members."); *id.* at ¶¶ 3, 13, 38–39, 56].

However, the "legitimate government goal" cannot be simply to provide treatment, as civil commitment of incompetent defendants is only constitutionally justifiable as a means to return those defendants to competence so they can assist in defending their criminal charges.

> [A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. . . . [E]ven if it is determined that the defendant probably soon will be able to stand trial, his continued commitment *must be justified by progress toward that goal*.

*Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (emphasis added). This requirement is baked into the rules governing civil commitment. *E.g.*, Minn. R. Crim. P. 20.01, subd. 7 ("The

head of the institution to which the defendant is committed . . . must report to the court periodically . . . on the defendant's mental condition with an opinion as to *competency to proceed*." (emphasis added)).

Courts considering these very circumstances have found that government defendants do not have "a legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months" because doing so "*undermines* the state's fundamental interest in bringing the accused to trial." *Mink*, 322 F.3d at 1122 (emphasis added) (citing *Illinois v. Allen*, 397 U.S. 347 (1970)); *id* (observing further that "Oregon courts commit persons found unfit to proceed to the care of OSH in order for OSH to evaluate, treat, and restore their mental health so that judicial proceedings may resume."); *Advoc. Ctr.*, 731 F. Supp. 2d at 624 (noting that plaintiffs "have not been convicted of any crime, . . . are not awaiting trial, and . . . are receiving next to no mental-health services," and concluding "[w]hile these Detainees are in parish jails, their continued confinement bears no rational relationship to the restoration of their competency."); *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 943–44 (E.D. Ark. 2002) ("The lengthy and indefinite periods of incarceration, without any legal adjudication of the crime charged, caused by the lack of space at ASH, is not related to any legitimate goal, is purposeless and cannot be constitutionally inflicted upon the members of the class."). Tellingly, defendants in each of those cases made the same arguments as the Commissioner does now: lack of funds, lack of trained staff, and lack of available facilities. *See Mink*, 322 F.3d at 1106; *Advoc. Ctr.*, 731 F. Supp. 2d at 605; *Terry*, 232 F. Supp. at 937–38. Each of those courts rejected those arguments. *See also Finney v. Arkansas Bd. of Correction*, 505 F.2d 194,

201 (8th Cir. 1974). ("Lack of funds is not an acceptable excuse for unconstitutional conditions of incarceration.").

Here, Defendant's purported alternative legitimate state objective fails as a matter of law. Defendant cannot excuse her refusal to transfer Plaintiff and Class members to state-operated treatment facilities, leaving them to suffer in jails without adequate treatment, due to a lack of available beds. But even beyond this, after Defendant's failure for nearly a decade to secure or allocate funding, or to benchmark for anticipated increases in patients requiring commitment at a treatment facility, she cannot in good faith claim that liability for Plaintiff's constitutional violations is due to anyone but her. Defendant's poor planning is not a legitimate government interest to which Plaintiff's or class members' fundamental rights should be subordinate. *See Ingram*, 846 F.3d at 287–88 (finding that regulations that caused detainees to be without clothing routinely was not reasonably related to a legitimate governmental purpose of "cleanliness and hygiene" because "[a] policy of cleanliness, though, does not explain why the jail is unable to stock and wash enough clothes to avoid extended periods without clothing on a more or less permanent basis."). Plaintiff's conditions of confinement count should therefore not be dismissed.

Finally, Defendant appears to argue that she exercised professional judgment in deciding if and when Plaintiff and Class members were transferred out of jails. [Mem., ECF No. 13 at 18].[6] But basing her decision on whether to transfer Plaintiff and Class

---

[6] Defendant's argument here is cursory and unclear. To the extent that Defendant does not develop an argument about professional judgment in response to Plaintiff's conditions of confinement count, Plaintiff believes this argument has been waived and cannot be

members on how many beds are available is an economic decision, not a medical one. *See Advoc. Ctr.*, 731 F. Supp. 2d at 623 ("In sum, the evidence presented indicates that the decision to keep the Detainees in parish jail is an economic one and not made out of concern for their mental-health treatment."); *Disability Law Ctr. v. Utah*, 180 F. Supp. 3d 998, 1012 (D. Utah 2016) ("There is no suggestion that the length of their detention, or the lack of adequate treatment, is the product of professional judgment. The State imposes these conditions on incompetent criminal defendants simply because there is no room at USH.").

While Defendant frames her decision making as "medical" because it allegedly takes into account consequences of overfilling the available treatment facilities, that is really an administrative problem and stretches the commonsense notion of "medical decision making" beyond recognition. In any case, Plaintiff has plausibly alleged that Defendant did not exercise professional judgment in her decision not to transfer Plaintiff. *See* [FAC at ¶¶ 13–14; 45–48; 55–56]. This claim should not be dismissed.

### 3.    Plaintiff Sufficiently Alleges Unreasonable Restraint.

Under *Youngberg*, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." 457 U.S. at 323. The Eighth Circuit, quoting *Beaulieu v. Ludeman*, 690

---

reanimated in a reply brief. *U.S. v. Carrillo*, 380 F.3d 411, 413 (8th Cir. 2004). Out of an abundance of caution, however, Plaintiff will respond *arguendo*, interpreting Defendant's argument as suggesting that, under *Bell*, the Court should defer to professional judgment of the institution's administrators when evaluating the relationship between the challenged condition and the government's interest.

F.3d 1017, 1032 (8th Cir. 2012), noted that "whether one applies *Youngberg*'s professional judgment standard or *Bell*'s punitive versus non-punitive distinction, the outcome is the same. Either approach results in the court deferring to the professional expertise of the institution's administrators when evaluating the relationship between the challenged condition and the government's interest." *Karsjens v. Harpstead*, 74 F.4th 561, 569 (8th Cir. 2023) (quotations omitted). Plaintiff has plausibly alleged unreasonable restraints.

Defendant's only response to Count V is that *Youngberg* only applies to "actual physical restraints." This is patently false. Here, Defendants cherry-pick their authority and ignore the wealth of case law in this Circuit that applied *Youngberg*'s professional judgment standard to conditions beyond actual physical restraints. *See United States v. Watson*, 893 F.2d 970, 979 (8th Cir. 1990), *opinion vacated as moot on reh'g sub nom*, 900 F.2d 1322 (8th Cir. 1990); *United States v. Holmes*, 900 F.2d 1322 (8th Cir. 1990) (forceable medication); *Dautremont v. Broadlawns Hosp.*, 827 F.2d 291, 300 (8th Cir. 1987) (involuntary use of psychotherapeutic drugs); *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (security cameras in single-user bathroom areas at sex offender treatment facility); *Moran v. Clarke*, 296 F.3d 638, 644 (8th Cir. 2002) (malicious prosecution); *Walton v. Dawson*, 752 F.3d 1109, 1120 (8th Cir. 2014) (failure to take reasonable steps to prevent inmate-on-inmate attack in county jail); *Beck v. Wilson*, 377 F.3d 884, 891 (8th Cir. 2004) (failure to enforce policies in involuntary inpatient substance abuse treatment facility that led to rape of a patient); *Detmer v. Gilmore*, 382 F. App'x 521 (8th Cir. 2010) (mail screening at state hospital); *Bradford v. Whitworth*, No. 4:05-CV-244 CAS, 2006 WL 1933808, at *3 (E.D. Mo. July 11, 2006), aff'd, 242 F. App'x 369 (8th Cir. 2007)

(withdrawing privileges from patient at sex offender facility for refusing a direct order and creating a disturbance); *Lee v. Pine Bluff Sch. Dist.*, 472 F.3d 1026, 1028 (8th Cir. 2007) (minor student prevented from participating in activities during school field trip due to illness); *Kolocotronis v. Schafer*, 972 F.2d 354, at *1 (8th Cir. 1992) (prohibiting patient at state medical facility from calling radio station); *Monahan v. State of Neb.*, 687 F.2d 1164, 1171 (8th Cir. 1982) (violations of Education for All Handicapped Children Act of 1975); *M.Y., ex rel., J.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 889 (8th Cir. 2008) (school district's denial of request for alternative transportation for handicapped student); *Todd v. Elkins Sch. Dist. No. 10*, 149 F.3d 1188 (8th Cir. 1998) (failure to provide adult aid for student with muscular dystrophy). In sum, it is simply not true that *Youngberg* only applies to actual, physical restraints. By failing to argue any other aspect of Plaintiff's *Youngberg* claims, Defendant has waived those arguments for their reply brief. *U.S. v. Carrillo*, 380 F.3d 411, 413 (8th Cir. 2004).

However, even if Defendant had not waived further argument on this count, Plaintiff has plausibly alleged that Defendant violated his and other class members, freedom from unreasonable restraint. The primary issue is whether Defendant actuallyexercised professional judgment in her decision to hold Plaintiff in jail. Because the analyses in *Bell* and *Youngberg* overlap, Plaintiff's arguments regarding professional judgment *supra* apply equally here. *Beaulieu*, 690 F.3d at 1032. The caselaw regarding incompetent criminal defendants cited *supra* is also equally applicable. In *Mink*, the Ninth Circuit held that, "balancing [plaintiffs'] liberty interests in freedom from incarceration and in restorative treatment against interests of the state [under Youngberg] . . . a balance favors the mentally

ill defendants awaiting trial." 322 F.3d 1101; *see also Advoc. Ctr.*, 731 F. Supp. 2d at 623

("because "the evidence indicates that the decision to keep the Detainees in parish jail is

an economic one and not one made out of concern for their mental-health treatment . . .

[t]he Court cannot find that the state's interest outweighs the Detainees' liberty interests

under the *Youngberg* inquiry."). Plaintiff has plausibly alleged that Defendant's actions in

leaving Plaintiff in a jail for an extended period of time without restorative treatment and

with *de minimus* medical treatment is such a substantial departure from professional

judgment that it demonstrates that Defendant was not, in fact, basing her decision on

professional judgment. Accordingly, Plaintiff's unreasonable restraints count should not

be dismissed.

### 4. Plaintiff Alleges Procedural Due Process Claims Based on the Amended Act.

Plaintiff further alleges that the Amended Act violates his procedural due process

rights under the Fourteenth Amendment, as it is targeted to a specific group of individuals.

The Fourteenth Amendment provides, in relevant part, that "no person shall be deprived of

property without due process of law. U. S. Const. Amend. 14. Due process analysis requires

that the Court determine if there is a protected life, liberty, or property interest, and if so,

what amount of process is required before one is deprived of such an interest. In general,

"the legislative determination provides all the process that is due." *See Conway v. Searles*,

954 F. Supp. 756, 766 (D. Vt. 1997) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S.

422, 433 (1982)); *see also Atkins v. Parker*, 472 U.S. 115, 127 (1985) (holding there was

no violation of due process where Congress made a system-wide change in the method of

computing Food Stamp eligibility without affording recipients a hearing); *Story v. Green*, 978 F.2d 60, 63 (2d Cir. 1992) (concluding that having enacted a statute that creates a right to public benefits, the legislature retains power to enact new legislation altering or eliminating the right).

However, some courts have recognized exceptions to this general rule.  *See Hagan v. Quinn*, 838 F. Supp. 2d 805 (C.D. Ill. 2012). Courts have found that "a due process claim is available when the legislature deprives property rights with legislation targeted at a particular individual or group of individuals, or that was adopted during the course of a legislative process that was somehow defective." *Id.* (citing *Conway*, 954 F. Supp. at 767).

Here, the Amended Act is specifically targeted at Plaintiff class members who received commitment orders prior to the Amended Act's effective date. *See Ellison Testimony*, *supra* note 3 at 7:42; [FAC at ¶¶ 3, 6, 10]. These individuals expected to be transferred out of jail and into treatment within 48 hours. The act was amended to specifically take away their rights under the MCTA by allowing transfer to a treatment program whenever DHS deems appropriate. [FAC at ¶¶ 3, 6, 10]. This is exactly the type of targeted legislation that the due process clause prohibits.

### 5.    Plaintiff Sufficiently Alleges a Substantive Due Process Claim.

Plaintiff alleges a substantive due process claim.[7] Defendant argues that the fundamental liberty interest Plaintiff invokes is an interest in being admitted to a state-run treatment program within 48 hours of his commitment. This is not the case. The liberty

---

[7] Plaintiff does not assert a fundamental substantive due process right to treatment in an inpatient setting. [Mem., ECF No. 13 at n.13].

interests implicated by non-admission to a treatment facility are well-established, fundamental, and identified in the statute. Under Minn. Stat. § 253B.03, individuals committed to state-operated treatment facilities—including those subject to priority-admission—have a right to be generally free from restraints, rights to correspond freely and communicate with persons outside the program, and a right to treatment adapted to rendering further supervision unnecessary. *See e.g. Kansas v. Hendricks*, 521 U.S. 346, 356 (1997) (observing that a non-absolute "freedom from physical restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action"); *Youngberg*, 457 U.S. at 316 ("As we have recognized that there is a constitutionally protected liberty interest in safety and freedom from restraint, . . . training may be necessary to avoid unconstitutional infringement of those rights."); [FAC at ¶ 14]. Defendants have not disputed that state-operated treatment facilities offer more safety and autonomy than jails or prisons. *Youngberg*, 457 U.S. at 315–16 (noting that the fundamental right to safe conditions "is not extinguished by lawful confinement, even for penal purposes. If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions.").

Defendant also wrongly asserts that Plaintiff has not alleged conduct that shocks the conscience because he "does not allege that his detention in the Stearns County Jail was unlawful, that while incarcerated his mental health deteriorated, that he experienced any health crisis, or that he did not receive meaningful or effective treatment for his mental illness." [Mem., ECF No. 13 at n.12]. Again, Defendant ignores the specific allegations in

Plaintiff's Complaint. *See* [FAC at ¶¶ 3, 13, 45, 56, 77, 78]. Moreover, there is no requirement that Plaintiff plead these specific facts to make out a case for violations of his substantive due process rights. It is sufficient for Plaintiff to allege that (1) he has not been convicted of any crime and therefore remains legally innocent (2) he is a member of a highly vulnerable group who require attention from trained health professionals; (3) by withholding the treatment and conditions Plaintiff needed and instead keeping him confined to an environment that is virtually guaranteed to worsen mental health symptoms, Defendant knowingly subjected him to cruel and punitive psychological abuse; and (4) Defendant has a consistent and long-standing pattern of treating civilly committed persons in a similar manner under bad faith legal pretexts. All of which are set forth in his Complaint. [FAC at ¶¶ 3, 6, 11, 13, 38–39, 45, 56, 64–65, 69, 77–78].

These allegations are easily subject to evidentiary proof and could certainly be found to betray rights implicit in ordered liberty and shock the conscience. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others. . . . If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional under the Due Process Clause to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." (quotations omitted)).

As pleaded, Plaintiff sufficiently states a substantive due process claim.

### D.   Defendant is Liable in Her Individual Capacity.

#### 1.   Plaintiff Pleads Defendant Was Personally Involved in the Violation of His Rights.

Plaintiff sufficiently alleges Defendant's personal involvement in his constitutional violation. "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants the plaintiff must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 968 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)). To survive a motion to dismiss, plaintiffs must "allege[] each individually named Defendant's personal involvement in the asserted violations with more than labels and conclusions, and a formulistic recitation of the elements of a cause of action will not do." *Allan v. Hebert*, No. 21-CV-166 (PJS/LIB), 2021 WL 8055443, at *6 (D. Minn. Dec. 15, 2021), *report and recommendation adopted*, No. 21-CV-0166 (PJS/LIB), 2022 WL 741040 (D. Minn. Mar. 11, 2022) (quoting *Twombly*, 550 U.S. at 555)). Here, Plaintiff has carried that burden.

Defendant complains that Plaintiff does not allege the Defendant participated in any constitutional violation, but Plaintiff does specifically make these allegations. First, Plaintiff generally alleges that Defendant lobbied the Minnesota Legislature to change the law to remove any deadline to move individuals to psychiatric hospitals or other facilities that would provide medical care for the mentally ill. [FAC at ¶¶ 4, 10]. Plaintiff also alleges that Defendant is the subject of numerous successful lawsuits alleging she had violated the

48-hour law, elected this course of action over requesting funds from the legislature that would ensure her compliance with the unamended act. [*Id.* ¶¶ 7, 10].

Further, Plaintiff plausibly alleges that as a result of Defendant's refusal to transfer him to a treatment facility, Defendant caused him pain and suffering, including the exacerbation of his objectively serious medical needs, including antisocial personality disorder, narcissistic personality disorder, and chemical dependency. [*Id.* ¶ 30]. Plaintiff alleges that Defendant actually knew about these needs because she received a court order placing Plaintiff in her custody for examination and treatment of those needs. [*Id.*] Defendant deliberately disregarded these severe medical needs by denying Plaintiff access to such treatment, leaving him to languish in the Sterns County Jail. [*Id.*]

In short, Counts III, IV, V, and VI each allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights. [*Id.* ¶¶ 28–59]. The totality of the facts alleged in the Complaint—cited above—are more than sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp.*, 550 U.S. at 570.

Defendant also argues that she is entitled to qualified immunity because Plaintiff has not alleged a constitutional violation. As stated for the reasons *supra*, Plaintiff has adequately pleaded constitutional violations and will not repeat those arguments here.

## 2.     Defendant Is Not Entitled to Qualified Immunity.

Defendant argues that she is entitled to qualified immunity because Plaintiff failed to allege that she violated clearly established rights. Specifically, she argues that she could not have violated clearly established rights because she acted pursuant to the Amended Act. This is wrong for several reasons.

First, Defendant cites no authority for the suggestion that a public official cannot violate clearly established constitutional rights if the official's actions complied with a statute. Second, Plaintiff is, in this very action, challenging the constitutionality of the Amended Act. Third, the legislation behind which Defendant seeks refuge was very recently her own bill, which her counsel testified was authored because DHS "was not meeting the requirements" of the existing law. Fourth, Plaintiff also alleges that Defendant violated his rights independently of the Amended Act—including by not admitting him long before the Amended Act took effect. Finally, and most importantly, the argument that Plaintiff has not alleged violation of his clearly established rights is directly contradicted by a recent Minnesota Supreme Court

In *McDeid v. Johnston*, the Court held that final court orders to transfer Minnesota Sex Offender Program patients to a reduced-custody program "are mandatory," and that "the right to timely transfer upon final approval is not abstract, and thus general, well-established legal principles, *so evident that they would be confirmed by general common sense* are sufficient to provide notice to a reasonable official that an extended delay violates that right." 984 N.W.2d 864, 879 (Minn. 2023) (emphasis in original) (quotation omitted); *id.* ("Our precedent and analogous Eighth Circuit cases establish relevant bedrock principles of law concerning the duty of public officials to follow court orders . . . .").

In *McDeid*, this same Defendant argued that because the relevant statute used the word "may" and provided no specific time to effectuate the transfer, it was left to her discretion. *Id.* at 876–877. Not only can Defendant make no such argument here prior to the effective date of the Amended Act, but the *McDeid* court disagreed with that argument:

> It is a well recognized rule that when a public officer is called upon to perform a public duty by statute and no time is specified for the performance of the act, it is required that the act be performed within a reasonable time. The fact that the statutory language was permissive in form did not matter: Whenever public interests or individual rights call for the exercise of a power given to public officials, the language used in conferring the power, though permissive in form, is to be deemed mandatory.

*Id.* at 878. A plain reading of Plaintiff's procedural due process claims and the statutes that give rise to the same demonstrate that the claims are adequately pleaded and should not be dismissed.

## III.   PLAINTIFF'S TORT CLAIMS ARE ADEQUATELY PLEAD

### A.   Defendant Is Not Entitled to Statutory Immunity.

Defendant contends that Plaintiff's constitutional and tort claims should be dismissed because she has statutory immunity under Minn. Stat. § 253B.23 subd. 4. That section provides: "All persons acting in good faith, upon either actual knowledge or information thought by them to be reliable, who act pursuant to any provision of this chapter or who procedurally or physically assist in the commitment of any individual, pursuant to this chapter, are not subject to any civil or criminal liability under this chapter." This argument lacks merit for several reasons.

First, Defendant claims that "there is no dispute that the Commissioner has acted in good faith." [Mem., ECF No. 13 at 23]. This is incorrect. Plaintiff not only alleges that "[t]he Commitment Act guarantees to those committed under it a right to numerous services and liberties not afforded to jail detainees, including a right "to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary," [FAC at ¶ 15], but that "Defendant

deliberately, unnecessarily, and wantonly caused Plaintiff to suffer." [*Id.* at ¶ 39]. Plaintiff also alleges that "Defendant actually knew that the conditions of jail are severely detrimental to individuals suffering from personality disorders and chemical dependency, yet she refused to remove Plaintiff from those conditions to get the treatment he needed." [*Id.* ¶ 31].

The fact that the Complaint includes claims for false imprisonment and intentional infliction of emotional distress—both intentional torts—should adequately demonstrate at this stage of the litigation that Plaintiff does dispute whether Defendant acted in good faith. Defendant points to no authority for the proposition that statutory immunity bars claims at the pleading stage unless a complaint surmises and challenges the sincerity of the defendant's reading of the law. Therefore, statutory immunity does not apply as to any of Plaintiff's claims.

Defendant also asserts that Plaintiff's claims "arise under the act" because Plaintiff alleges that the injuries resulted from the Commissioner's failure to protect Plaintiff's rights during through enforcing the Commitment Act. However, Counts VII–IX neither mention nor implicitly rely on any part of the Commitment Act. More fundamentally, the argument that statutory immunity requires dismissing the Complaint because the claims implicate rights and duties under the Commitment Act directly contradicts Defendant's repeated assertion that the rights and duties Plaintiff invokes are not created by the act.

### B.     Plaintiff Sufficiently Alleges Intentional Infliction of Emotional Distress.

A claim for intentional infliction of emotional distress requires the plaintiff to allege the defendant's conduct was "(1) extreme and outrageous; (2) intentional and reckless; (3) that it caused emotional distress; and (4) was so severe that no reasonable person could be expected to endure it." *Heimbach v. Reidman Corp.*, 175 F. Supp. 2d 1167, 1179 (D. Minn. 2001). This tort is "sharply limited to cases involving particularly egregious facts." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983).

Defendant's entire response to this count is her unsupported assertion that "the conduct [Plaintiff] alleges simply does not rise to the level of an atrocity beyond the bounds of decency." [Mem., ECF No. 13 at 25]. But it is clear when looking at the Complaint that Plaintiff plausibly alleges all of these elements, which is all that is required on a motion to dismiss. Plaintiff alleges that Defendant's conduct was extreme and outrageous because, after receiving commitment orders for Plaintiff and members of the Class, she continued to keep these individuals with severe mental health symptoms—individuals who had not been convicted of any crime and required substantial treatment—in jails for months at a time, where they received *minimus* mental health treatment, causing them to suffer. [FAC at ¶¶ 3, 11, 13, 38–39, 45–48, 56, 64–65, 69–71]; *see also Mink*, 322 F.3d at 1122 ("County jails are simply unable to provide restorative treatment, and the jails' disciplinary systems may exacerbate the defendants' mental illnesses."); *Trueblood*, 73 F. Supp. 3d at 1317 ("Jails are punitive environments by their definition, and the conditions of confinement undermine the mental health of detainees as well as the state's interests in competency

restoration and trial."). Plaintiff alleges that the conduct was "intentional and reckless" because, as Commissioner of DHS, Defendant knew of Plaintiff's medical needs, and knew that he would receive *de minimus* treatment while incarcerated in jail. [FAC at ¶ 69–70]. Plaintiff sufficiently alleges that Defendant's actions caused him emotional distress. [FAC at ¶ 71]. Finally, Plaintiff alleges that Defendant's actions were so severe that no reasonable person could be expected to endure it. [FAC at ¶ 72]. As such, this is a case that alleges that, with full knowledge by the Defendant, individuals—who have been found incompetent to assist in their own defense, in need of treatment, and placed in the custody of Defendant—are enduring long periods of incarceration in jail, without being found guilty of a crime. No reasonable person could be expected to endure the treatment that Plaintiff and the class members have received.

Defendant asserts that Plaintiff's claim fails because he "does not dispute that his confinement was lawful," he does not dispute that "the Commissioner is alleged only to have ensured that medically appropriate treatment was available" and that Plaintiff "does not allege that he did not receive adequate treatment while waiting for transfer." D. Mot at 25. Although none of these are required for an intentional infliction of emotional distress claim, Plaintiff's allegations set forth in the Complaint speak for themselves. *See* [FAC at ¶¶ 38–39, 56, 64, 69–72, 76–77]. Plaintiff has plausibly alleged a claim for intentional infliction of emotional distress.

### C. Plaintiff Sufficiently Alleges Negligent Infliction of Emotional Distress.

To state a claim for negligent infliction of emotional distress, "a plaintiff must plead the general elements of negligence—that is, 'a legal duty of the defendant to protect the

plaintiff from injury,' a breach of that duty, proximate cause, and injury—as well as two additional elements—'that the defendant should have realized that his conduct involved an unreasonable risk of causing distress" and "that the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant.'" *Couzens v. Donohue*, 854 F.3d 508, 518 (8th Cir. 2017) (quoting *Thornburg v. Fed. Express Corp.*, 62 S.W.3d 421, 427 (Mo. Ct. App. 2001)).

Defendant devotes one sentence to Plaintiff's Negligent Infliction of Emotional Distress claim: "Plaintiff included the words 'severe mental anguish' but does not allege facts to support the label." [Mem., ECF No. 13 at 26]. Plaintiff does set out allegations for a negligent infliction of emotional distress claim. He alleges the duty and the conduct that violated that duty. [FAC at ¶¶ 13–14, 75–76]. He also alleges how he was injured by the breach of that duty. [*Id.* at ¶¶ 77–80]. He also alleges that the Commissioner knew that her conduct was harming Plaintiff and that the Plaintiff suffered mental injuries as a result. [*Id.* at ¶¶ 13, 78–80 (describing that "conditions and lack of treatment can worsen [plaintiffs'] symptoms and present a serious risk to them, other detainees, or staff"), 39 ("conditions of jail are severely detrimental to individuals suffering form the medical needs for which Plaintiff and Class members are committed."), 77 ("Plaintiff and Class members suffered injuries while held in jail because they were not given necessary care and treatment and because the environment of jail is counter-therapeutic.")]. These allegations are sufficient on a motion to dismiss.

### D.       Plaintiff Sufficiently Alleges False Imprisonment.

"[T]he elements of false imprisonment are (1) words or acts intended to confine, (2) actual confinement, and (3) awareness by the plaintiff that he is confined." *Blaz v. Molin Concrete Prod. Co.*, 244 N.W.2d 277, 279 (Minn. 1976). Despite citing a plethora of caselaw, Defendant fundamentally offers only two arguments as to why Plaintiff's false-imprisonment claim should be dismissed—both of which pertain to the first element.

First, Defendant argues that Plaintiff's prolonged detention in jail is not unlawful, because his initial confinement was pursuant to a lawful court order, and "[t]he Commissioner had no custody or control of Plaintiff until after the patient's arrival at the designated treatment facility." [Mem., ECF No. 13 at 26]. The implied but unstated premise of Defendant's argument is that an order for confinement in jail remains lawfully in effect until the detainee is admitted to a treatment program. As an initial matter, this argument begs the question. The crux of Plaintiff's claims is that Defendant's refusal to admit committed individuals to medical treatment programs is unlawful. *See generally Kleidon v. Glascock*, 10 N.W.2d 394, 397 (Minn. 1943) (noting that false imprisonment is "any imprisonment which is not legally justifiable").

The argument that individuals with priority commitment orders cannot be unlawfully confined in jails because the jails retain lawful custody "until after the patient's arrival at the designated treatment facility" misrepresents the MCTA. Defendant cites Minn. Stat. § 253B.10, subd. 1(c). That paragraph provides:

> Upon the arrival of a patient at the designated treatment facility, state-operated treatment program, or community-based treatment program, the head of the facility or program shall retain the duplicate of the warrant

and endorse receipt upon the original warrant or acknowledge receipt of the order. The endorsed receipt or acknowledgment must be filed in the court of commitment. After arrival, the patient shall be under the control and custody of the head of the facility or program.

If the Commissioner is the "head" of state-operated treatment programs,[8] her assertion that she does not take custody or control until "after arrival" per section 253B.10, subdivision 1(c), is plainly contradicted by any reasonable reading of the surrounding context. Subdivision 1(a) provides the general procedure: "When a person is committed, the court shall issue a warrant or an order *committing the patient to the custody* of the head of the treatment facility, state-operated treatment program, or community-based treatment program." (emphasis added). Subdivision 1(b)—the priority-admission paragraph— requires the commitment of individuals subject to priority admission to "be ordered by the court as provided in section 253B.09, subdivision 1, paragraph (d)," which in turn provides that "[i]f a person is committed to a state-operated treatment program . . . the court shall order the commitment to the commissioner." Therefore, to the extent that the "after arrival" sentence in Minn. Stat. § 253B.10, subd. 1(c) is not redundant or superfluous, it clearly can only apply to judicial commitments under other provisions.[9]

---

[8] Minn. Stat. § 253B.02, subd. 8, defines "head of the facility or program" as "the person who is charged with overall responsibility for the professional program of care and treatment of the treatment facility, state-operated treatment program, or community-based treatment program." In subdivision 3 of the same section, "commissioner" is separately defined as "the commissioner of human services or the commissioner's designee."

[9] One example could be where an individual proposed for commitment is released to the custody of another individual or agency prior to the issuance of a commitment order under Minn. Stat. § 253B.095, subd. 1.

Second, Defendant contends that there can be no false imprisonment claim because Plaintiff does not allege that Defendant affirmatively caused his confinement. Defendant's insistence that a false imprisonment claim only exists where the Defendant affirmatively took steps to initially confine the plaintiff overstates the law. It has been repeatedly held that even where the initial confinement was lawful, a plaintiff can maintain a false imprisonment claim if he or she becomes legally entitled to release or transfer and the defendant, who has the authority to release the plaintiff, takes no action. *See, e.g.*, *Perkins v. St. Louis Cnty.*, 397 N.W.2d 405, 408 (Minn. Ct. App. 1986) (noting the distinction between false arrest, which is "an arrest is made without proper legal authority," and false imprisonment, which is "[s]ubsequent restraint . . . any imprisonment which is not legally justifiable"); *Parada v. Anoka Cnty.*, 332 F. Supp. 3d 1229, 1246 (D. Minn. 2018) (denying motion to dismiss false-imprisonment claim where plaintiff alleged that she was detained in jail past entitlement to release); *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 948 (D. Minn. 2017) (finding an actionable false imprisonment claim where the plaintiff alleged that he was held beyond the time he should have been released due to municipal policies). Therefore, Plaintiff's allegation that "Defendant acted intentionally to confine" him and "caused such confinement to continue" adequately states a claim for false imprisonment. [FAC at ¶ 82].

### E.    Damages on Plaintiff's State Constitutional Claims.

Defendant argues that Plaintiff's claims for damages under the Minnesota Constitution should be dismissed because "Minnesota courts do not permit money damages for claims based on violations of the Minnesota Constitution." [Mem., ECF No. 13 at 27].

Plaintiff acknowledges the line of cases from the Minnesota Court of Appeals holding that "there is no Minnesota counterpart to [42 U.S.C. §] 1983." *Kunshier v. Minnesota Sex Offender Program*, No. A09-0133, 2009 WL 3364217, at *5 (Minn. Ct. App. Oct. 20, 2009). While the Court of Appeals has declined to recognize a claim for damages directly under the Minnesota Constitution, this has not been because such a claim would have no basis in legal precedent or compelling policy. Rather, it has been for the simple reason that "the Minnesota Supreme Court has not as yet recognized a [claim] of this nature" *Bird v. Dep't of Pub. Safety*, 375 N.W.2d 36, 40 (Minn. Ct. App. 1985). The Eighth Circuit Court of Appeals has followed suit:

> Minnesota courts explicitly refuse to find causes of action for damages under the Minnesota Constitution on their own unless the Minnesota Supreme Court has recognized the cause of action. We agree with the district court that because the Minnesota Supreme Court has not established an action for damages for these constitutional violations, the [plaintiffs'] claims fail.

*Riehm v. Engelking*, 538 F.3d 952, 969 (8th Cir. 2008) (citations omitted).

Plaintiff respects that this Court is bound by the decisions of the Eighth Circuit. For this reason, should the Court be inclined to dismiss the claims brought under the Minnesota Constitution, Plaintiff would request that the Court certify this question to the Minnesota Supreme Court pursuant to Minn. Stat. § 480.065, subd. 5.

## IV.   IF THE COURT GRANTS DEFENDANT'S MOTION TO DISMISS ON ANY OF PLAINTIFF'S CLAIMS, IT SHOULD BE WITHOUT PREJUDICE

For the aforementioned reasons, the Defendant's motion should be denied in its entirety. If the Court grants any part of the motion, however, it should be without prejudice.

Defendant requests dismissal with prejudice but does not offer any justification for this result.

"[C]ourts ultimately have discretion to decide between a with-prejudice and without-prejudice dismissal." *Judah v. Ovsak*, 550 F. Supp. 3d 687, 709 (D. Minn. 2021). When a plaintiff's claims "might conceivably be repleaded with success," particularly where discovery might reveal yet-unknown facts relevant to a dismissed claim, dismissal without prejudice may be justified. *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *report and recommendation adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019). Here, Defendant has alleged deficiencies she contends mandate dismissal under Rule 12(b)(6), but she has not established that the allegations in the FAC, if true, plausibly state claims to relief. Additionally, new facts surrounding Defendant's misconduct continue to become available, including Defendant failing to admit committed individuals even more than 48 hours after determining that a medically appropriate bed is available. Accordingly, dismissal with prejudice is not warranted.

## CONCLUSION

For the aforementioned reasons, the Court should deny Defendant's motion in its entirety. Should the Court grant any part of Defendant's motion to dismiss, Plaintiff requests that it do so without prejudice and with leave to amend.

Dated: August 16, 2023

**GUSTAFSON GLUEK PLLC**

*/s/Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
David A. Goodwin (#386715)
Anthony J. Stauber (#401093)
Joseph E. Nelson (#402378)
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
Fax: 612-339-6622
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
tstabuer@gustafsongluek.com
jnelson@gustafsongluek.com

**JASPERS, MORIARTY &
WETHERILLE, P.A.**
Kevin J. Wetherille (#033036X)
James P. Conway (#0391044)
206 Scott Street
Shakopee, MN 55379
(952) 445-2817

**THRONDSET MICHENFELDER, LLC**
Jason Gustafson (#0403297)
One Central Avenue West
St. Michael, MN 55376, Suite 101
Tel: (763)-515-6110
Cell: (612)-889-0341

**FREMSTAD LAW**
Hannah L. Scheidecker (#0401987)
3003 32nd Ave. S., Ste. 240
Fargo, ND 58103
(701) 478-7620
hannah@fremstadlaw.com

*Attorneys for Plaintiff and the Proposed
Class*