UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Kyle Jerome Dalen, | Case No. 23-cv-1877 (ECT/ECW) |
| Plaintiff, | |
| vs. | **DEFENDANT'S MEMORANDUM OF LAW OPPOSING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| Jodi Harpstead, Commissioner of the Minnesota Department of Human Services, in her individual and official capacities, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Dalen asks this Court to enjoin the State of Minnesota from giving effect to its law. Injunctive relief is always extraordinary relief, but a plaintiff seeking to prevent a state from following its law bears an even greater burden to demonstrate the strength of his claims. Mr. Dalen falls far short. He offers no evidence that his claims are likely to succeed and no evidence demonstrating that, absent the relief he demands, he is at risk of irreparable harm. One reason Mr. Dalen cannot meet his burden is that the relief he seeks is not connected to the problem that he wants to address. Mr. Dalen seeks to block the addition of an acknowledgement that admission for mental health treatment requires capacity to provide treatment in a medically appropriate setting, even for those who are being admitted under the priority admission law. But the problem is that the need for treatment exceeds the available capacity, not the acknowledgement. Enjoining the amendment could do nothing to solve that problem. This motion should be dismissed.

## FACTUAL AND PROCEDURAL
## BACKGROUND

I.   **MR. DALEN'S CRIMINAL CHARGES, CIVIL COMMITMENT, AND PLACEMENT ON DHS'S PRIORITY ADMISSION WAITLIST.**

A.   **Mr. Dalen's Criminal Charges and Civil Commitment.**

In 2021, Plaintiff Kyle Jerome Dalen was arrested in Itasca County for harassment and violation of a restraining order. *See* Register of Actions *State v. Dalen*, Itasca County District Court, Ninth Judicial District of Minnesota, Case No. 31-CR-21-1240 (*State v. Dalen I*) (Itasca Cnty. Dist. Ct. Jan. 14, 2022) (Index # 36). Mr. Dalen appears to have been granted conditional release with payment of $3,000 bail on May 27, 2021. *Id.*, Non-Cash Bond Posted (May 27, 2021) (Index #13). Mr. Dalen was later found incompetent to stand trial. *See* Order and Findings of Fact, *State v. Dalen*, Itasca County District Court, Ninth Judicial District of Minnesota, Case No. 31-CR-21-1240 (Jan. 14, 2022) (Index # 36). Mr. Dalen was not held in jail pending a hearing on his civil commitment. *Id.* In November 2022, Mr. Dalen was civilly committed for mental health treatment. See *In the Matter of the Civil Commitment of Kyle Jerome Dalen*, Itasca County District Court, Ninth Judicial District of Minnesota, Case No. 31-PR-22-2358 (*In re Dalen*), Findings/Conclusions/Order (November 9, 2022)). Both examiners recommended that Mr. Dalen receive outpatient treatment. *Id.* at 2. At this time, Mr. Dalen was civilly committed to the Commissioner and to the head of a substance use disorder treatment facility licensed under Minnesota Chapter 245G. *See* Declaration of Dr. KyleeAnn Stevens, ¶ 50. He was not in custody at that time. ████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████ *Id.*

In March 2023, Mr. Dalen was criminally charged in Stearns County District Court with three felony counts for stalking. Complaint, *State v. Dalen*, No. 73-CR-23-2528 (*State v. Dalen II*) (Stearns Cnty. Dist. Ct. Mar. 29, 2023). On or around April 3, 2023, Mr. Dalen was detained in Stearns County Jail, subject to posting bail of $150,000, with no conditions, or $50,000, with conditions. *Id.*, Register of Actions.

On May 3, 2023, following Mr. Dalen's arrest in Stearns County, the Itasca Court continued Mr. Dalen's commitment for six months. *In re Dalen*, Findings, Conclusions, and Order for Continued Commitment. Mr. Dalen was transferred to the Anoka Metro Regional Treatment Center (AMRTC) on June 6, 2023. *See In the Matter of the Civil Commitment of Kyle Jerome Dalen,* Dakota County District Court, First Judicial District of Minnesota, Case No. 19HA-PR-23-505, Order to Transport (Index # 61).

On July 27, 2023, Mr. Dalen pled guilty to two counts of felony stalking, and the third count was dismissed. *See State v. Dalen*, Register of Actions, Interim Conditions (July 27, 2023). Although Mr. Dalen has not yet been sentenced, he is eligible for release on conditions without bail. *Id.* (requiring, inter alia, that Mr. Dalen not contact the victim, avoid drugs and alcohol, and take medications as prescribed).

**B.    Mr. Dalen Could Not Be Admitted for Treatment at a DHS Facility Until a Medically Appropriate Bed Was Available.**

████████████████████████████████████████████████████████

████████████████████████████████████████ Stevens Dec., ¶ 51. ████████████

████████████████████████████████████████████████████████████,

described in detail below.  *Id.*

### 1.   DHS hospitals for patients civilly committed as mentally ill.

DHS has seven primary hospitals that serve patients who are civilly committed as persons who pose a risk of harm due to mental illness.  The first is AMRTC, which is a psychiatric hospital that primarily serves civilly committed patients with highly complex medical conditions and who may exhibit volatile behaviors.  *Id.* ¶ 4.  These patients typically cannot, or will not, be treated at community hospitals that may lack the necessary clinical expertise, safe facilities, and support staff.  *Id.*  The remaining six are Community Behavioral Health Hospitals ("CBHH"), which are small, 16-bed psychiatric hospitals that primarily serve civilly committed patients.  *Id.* ¶ 5.  The tools and capacity available to CBHHs to manage aggressive patients are substantially different than AMRTC, given the physical environment and staffing levels at CBHHs.  *Id.*  They are not equipped for high acuity treatment interventions such as repeated restraint and seclusion, or for highly destructive patient behavior.  *Id.*  They are also less secure than AMRTC.  *Id.*

### 2.   DHS's admission procedure.

In accordance with DHS's Direct Care and Treatment ("DCT") policy and regulations from the federal Centers for Medicare and Medicaid Services ("CMS"), all patients must be admitted to DCT hospitals under the care of a physician.  *Id.* ¶ 8.  A physician can only admit a patient to a hospital if that hospital is capable of safely serving that patient and others.  *Id.* ¶ 9.  Admitting more patients than can be safely served given patient acuity, milieu acuity, anticipated patient needs, physical plant limitations, staffing limitations, and regulatory requirements puts existing patients and new patients, as well as

staff, at significant risk.  *Id.*  Regulatory sanctions that could result from admitting more patients than can be safely served could result in DCT hospitals losing CMS certification or licensure by the Minnesota Department of Health ("MDH").  *Id.*  These or other licensing and regulatory violations would threaten the ongoing existence of these programs. *Id.* ¶ 53.

For every patient referred to a DHS treatment facility to whom the priority admission statute is applicable, DHS follows the same admissions process. *Id.* ¶ 11. First, CPA's assessment team reviews and evaluates the referral by gathering information (e.g., jail logs, incident reports, medical information, and verbal reports) from the jail where the patient is located.  *Id.* ¶ 13.  CPA staff will also usually contact the patient's county case manager to obtain additional information.  *Id.*  If CPA's initial screening suggests AMRTC is the best placement option, the referral is then sent to AMRTC medical leadership for review of that referral's individual needs.  *Id.* ¶ 15.

The CPA assessment team simultaneously screens priority referrals for possible placement at a CBHH.  *Id.* ¶ 16.  Certain priority referrals are not appropriate for CBHH placement and therefore not referred to a CBHH.  *Id.*  Those referrals include individuals who are civilly committed but have characteristics that would make treatment at a CBHH inappropriate, such as those deemed dangerous to the public, who are recently aggressive, who are unwilling to accept psychotropic medication, who have a criminal sexual history, who are currently in segregation due to safety concerns, or who have current criminal charges related to weapons or assault.  *Id*. Individuals demonstrating aggression toward health care workers or authority figures such as law enforcement also generally cannot be

safely managed in a CBHH setting. *Id.* If it is not clear to which hospital level program the referral should be sent, a priority referral is sent to the AMRTC Medical Director and the CBHH Medical Director for further clinical assessment and direction. *Id.* If a referral decision is not resolved at that level, the MHSATS Medical Director or the Executive Medical Director for Behavioral Health provides direction. *Id.*

If a priority referral to DCT does not appear to require hospital level of care and is not civilly committed as MI&D, CPA staff will discuss the referral with medical leadership and consider whether referring the person to a DCT residential facility (such as a Community Addiction Recovery Enterprise program or Minnesota Specialty Health System program) or community placement is appropriate. *Id.* ¶ 17.

DHS's admission procedure did not change as a result of passage of the Amended Act. *Id.*, ¶ 48.

### 3. Capacity challenges at AMRTC and the CBHHs.

As stated, each of the CBHHs can accommodate, at most, sixteen patients. *Id.* ¶ 5. AMRTC's capacity is dependent on numerous factors including CMS and MDH rules and a myriad of other regulations. *Id.* ¶ 25. On any given day, available treatment bed capacity varies, depending on the acuity of the current patients as well as the anticipated needs of referred individuals. *Id.* It can also be affected by factors such as COVID-19 and facility space issues. *Id.* High acuity patients require more physical space, separation from other patients, privacy, and a higher staff-to-patient ratio, all of which can impact and reduce overall treatment bed capacity at a hospital, including DCT hospitals. *Id.* ¶ 26. At

6

AMRTC, patients with these complex needs or aggressive or challenging behaviors may require Intensive Care Areas (a section of a unit that can be physically closed off from the larger unit to provide a smaller and safer treatment area with dedicated staff always present for a patient with acute needs) or Low Stimulation Environments (a section of a unit where stimulation such as lights, sounds, etc. can be controlled and limited) to address their medical needs, both of which limit the number of beds available for other patients. *Id.* Patients are often unable to safely share rooms with a roommate, which reduces the number of beds available. *Id.*

Other factors also directly and significantly impact DCT program bed capacity and admissions timelines, including discharge delays for current patients; lack of community placement options; lack of funding for additional capacity; staffing shortages; changes in the patient population; and COVID-19 disruptions. *Id.* ¶ 27. Ballooning admissions rates from jails and correctional facilities also place significant stress on DCT's bed capacity and admissions times are reflected in the chart below:

| Year | Number of DCT Admissions under 253B.10 |
|------|----------------------------------------|
| 2014 | 113 |
| 2015 | 153 |
| 2016 | 168 |
| 2017 | 231 |
| 2018 | 289 |
| 2019 | 258 |
| 2020 | 260 |

| 2021 | 323 |
|------|-----|
| 2022 | 393 |

*Id.* ¶ 24.

DHS cannot admit new patients until counties have arranged appropriate community discharge placements for current patients. *Id.* ¶¶ 28, 30. When current AMRTC or CBHH patients who no longer require a hospital level of care cannot be promptly discharged, those delays directly impact program admissions because patients who do not need the level of care provided by the facility stay longer than is medically necessary, rendering those beds unavailable to individuals who do require that level of care. *Id.* ¶ 28.

Minnesota is also currently experiencing a notable shortage of community-based care providers, such as group homes, adult foster care homes, and Intensive Residential Treatment Services programs. *Id.* ¶ 36. Relatively few DCT patients, and particularly those discharging from DCT's highest levels of care, can discharge to their own homes. *Id.* Many individuals discharging from AMRTC or the CBHHs require a community-based care setting, and the ongoing shortage of these options in the community has led to significant backups in DCT hospitals. *Id.*

Further, treatment capacity is not simply measured in the number of physical beds at a facility. *Id.* ¶ 41. A health care program also must have the right number and mix of highly trained and skilled staff. *Id.* DCT has experienced significant staffing shortages over the past three years, and like many health care systems in Minnesota and nationwide, DCT has struggled to recruit and retain personnel, especially highly skilled nurses and

many other direct care staff who care for, assist, and monitor DCT's unique patient population. *Id.* Currently, even if DCT had additional money appropriated from the Legislature to build new programs, DCT likely would not be able to recruit and hire sufficient staff to operate those programs. *Id.*

Finally, the COVID-19 pandemic and related disruptions have also had a significant impact on DCT's ability to admit priority referrals. *Id.* ¶ 46. Since October 2020, periodic COVID-19 outbreaks have forced DCT to stop admissions to individual CBHHs as well as to multiple treatment units at AMRTC often for weeks at a time for those programs to comply with isolation and quarantining requirements of the Centers for Disease Control and MDH. *Id.*, ¶ 45. Over this same period, there have been months when three or four out of six treatment units at AMRTC were unable to accept new admissions due to COVID-19. *Id.*, ¶ 46.

### 4.   AMRTC and the CBHHs operate at capacity.

As of September 28, 2023, all the available beds at AMRTC were filled with patients. *Id.*, 47. All available beds across CBHH's were either filled with patients or scheduled for new patient admission. *Id.* As of September 28, 2023, CARE and MSHS programs were at or near full capacity. *Id.* All medically appropriate beds available for priority admissions were currently full or otherwise scheduled to take admissions. *Id.*

### 5.   DHS does not have funding to increase its bed capacity.

DCT receives all of its funding for its hospitals through legislative appropriations. Declaration of Lynn Glancey ¶¶ 2, 3. DHS and DCT may only spend money that is appropriated for specific purposes and programs on those items. *Id.* ¶ 5.

DHS is not appropriated extra funding that one DCT program could redistribute to another without reducing its own capacity. *Id.* ¶ 6.

To construct new buildings or renovate existing buildings, DCT must receive funding from the Legislature through the capital projects process. *Id.* ¶ 11. DCT cannot, however, take existing appropriated operating funds and use those funds for construction of new program buildings without legislative authority. *Id.* ¶ 16. But even if the Legislature appropriated such funding to DCT, it generally would take 9–12 months to complete pre-design work; it would then take another 2–3 years to complete actual construction of a new building. *Id.* ¶¶ 13, 14.

DHS is obligated to operate within the appropriation it receives from the Legislature, and it is required to have a balanced budget at the end of each biennium. *Id.* ¶ 27. DHS does not have any available funding that is not already earmarked for another purpose from the Legislature to construct new buildings or renovate existing program buildings. *Id.* ¶¶ 29, 30.

### 6.     Despite its efforts, DCT has been unable to fully staff its treatment programs.

Despite efforts to recruit and retain staff, DCT continues to have unfilled staff positions. *Id.* ¶ 26; *see also* Stevens Decl., ¶¶41-43. AMRTC's overall vacancy rate for full-time equivalency (FTEs) as of September 22, 2023 was 19.7%. Glancey Decl., ¶26. The vacancy rate for unit staff (Human Services Technicians, licensed practical nurses (LPNs), Mental Health Program Assistants, registered nurses (RNs) and Security Counselors) at AMRTC was 21.6%, meaning 57 positions were unfilled; there was also

one unfilled psychiatrist position, which results in a vacancy rate of 25% for psychiatrists at AMRTC. *Id.* The overall vacancy rate for FTEs across CBHHs was 13.8% as of September 22, 2023. *Id.* The vacancy rate for unit staff across CBHHs was 13.3%, meaning 35.5 positions were unfilled; there was also approximately one unfilled psychiatrist position, which results in a vacancy rate of 16.1% for psychiatrists across the CBHHs. *Id.*

### 7.   DHS's priority admission waitlist.

Because DHS receives more priority admission referrals than it has available beds, DHS maintains a waitlist. Stevens Decl. ¶¶ 18, 49. The priority admission waitlist is ordered by date and time that an individual's priority referral order is received by CPA. *Id.* An individual may be admitted "out of order" from this waitlist if a bed becomes available in a program or on a unit that individuals closer to the top of the waitlist are not clinically appropriate for. *Id.* For example, if a female referral is number one on the priority waitlist but the next available bed is on an all-male unit, the next male referral on the priority waitlist would be admitted in front of the female referral. *Id.* CPA staff offer coordination of clinical consultation for jails while admissions are pending on the waitlist. *Id.* ¶ 19.

DCT's referral population has become increasingly more challenging and complex over the past eight years, and specifically has grown to include significantly higher numbers of individuals admitted directly from jails. *Id.* ¶ 24. Between 2014 and 2022, admissions under the priority admission law increased 247% percent. *Id.* As noted above, in 2014, DCT admitted 113 people subject to the priority admission statute; in 2022, that number was 393. *Id.*

11

DHS's priority admission waitlist process did not change as a result of passage of the Amended Act. *Id.*, ¶ 48



8.

*Id.* ¶ 51.

*Id.*

*Id.*

## II. THE AMENDED ACT.

Minnesota Statute section 253B.10, subd. 1(b) requires the Commissioner to prioritize the admission of certain individuals who are ordered to be confined in, or civilly committed to, a state-operated treatment program, and who are residing in a jail or correctional institution. Prior to May 24, 2023, this "priority admission" statute stated simply that individuals "must be admitted to a state-operated treatment program within 48 hours" without explicitly identifying what event starts this 48-hour period. The Commissioner understood that, under this version of the statute, the 48 hours ran from the time a medically appropriate bed is available, as any other interpretation leads to an absurd and dangerous result. Defendant Memorandum of Law in Support of Motion to Dismiss (ECF 13) ("Defendant's MTD Memo"), 9.

Effective in May 2023, the Minnesota Legislature passed and the Governor signed a bill amending Minnesota Statute § 253B.10, subd. 1, (the "Amended Act"). *See* S.F.No.

2934, 93rd Legislature, Chapter 61, article 4, section 7. The Amended Act includes a new subdivision 1(e), which reads: "Patients described in paragraph (b) must be admitted to a state-operated treatment program within 48 hours of the Office of Medical Director, under section 246.018, or a designee determining that a medically appropriate bed is available. This paragraph expires on June 30, 2025."

This amendment was passed through the 93rd Legislature as part of the DHS Omnibus Bill. *See* S.F.No. 2934, 93rd Legislature, Chapter 61, article 4, section 7. In passing the Omnibus Bill, the Legislature held at least 13 hearings, including at least three that included public comment, on the bill. Declaration of Carrie Briones, ¶3.

In addition to enacting the Amended Act, passage of the Omnibus Bill established a task force to evaluate the impact of the priority admissions statute. *See* S.F.No. 2934, 93rd Legislature, Chapter 61, article 4, section 13. The Task Force is to issue a report by February 1, 2024, that includes recommendations to improve the priority admissions requirements and process; ways to ensure state-operated programs have medical discretion to prioritize those with the most acute need or risk regardless of referral path; additional ways to meet treatment needs for those referred to state-operated programs and in the community; and any other relevant findings, research, or analyses conducted or produced by the task force. Briones Dec., ¶ 4. The task force expires on June 30, 2024. *Id.*

## III. THE PRESENT LITIGATION.

On May 31, Plaintiff personally served the present putative class action lawsuit against the Commissioner, who removed the action to federal court on June 21. ECF 1. On July 5, Mr. Dalen amended his complaint to allege a putative class action. ECF 10

(the "Complaint" or the "FAC"). Mr. Dalen's claims arise out of allegations that the Amended Act and the Commissioner's priority admission process and practice violate the U.S. and Minnesota constitutions. Mr. Dalen also raises four Minnesota tort claims. Mr. Dalen seeks to represent the following putative class:

> All persons who have been detained in any jail or prison for more than 48 hours after having been ordered civilly committed under circumstances described in any of the four sub-paragraphs of Minnesota Statutes Section 253B.10, subdivision 1, paragraph (b)(1)–(4).

FAC., ¶ 15.

Defendant moved to dismiss the Complaint on July 19. ECF # 11-15. That motion has been fully briefed.

Mr. Dalen now moves for a preliminary injunction, on behalf of himself, that would enjoin the State of Minnesota from implementing the Amended Act. Plaintiff's motion is scheduled to be heard at the same time as Defendant's motion to dismiss. ECF 31.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To determine whether to issue a preliminary injunction, "the district court must consider: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury that granting the injunction will inflict on the other interested parties; (3) the probability the movant will succeed on the merits; and (4) whether the injunction is in the public interest." *Izabella HMC-MF*, 378 F.Supp.3d at 777-78 (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). The party seeking injunctive relief bears the burden of proving all the

preliminary injunction factors. *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

A preliminary injunction is already an extraordinary remedy, but the burden is even higher

when a party requests a mandatory preliminary injunction requiring the alteration of the

status quo. *See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484,

486 (8th Cir. 1993).

A party seeking to enjoin enforcement of a duly enacted state statute also bears a

heightened burden to demonstrate that they are "likely to prevail on the merits." *Rodgers

v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019). (quoting *Planned Parenthood Minn. v.

Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008)) (en banc). This is more than the "fair

chance" of success that is typically required for a preliminary injunction. *Id.* "The higher

bar reflects the idea that governmental policies implemented through legislation and

developed through presumptively reasoned democratic processes are entitled to a higher

degree of deference and should not be enjoined lightly." *Id.* at 455–56 (quotation omitted,

cleaned up).

## ARGUMENT

### I.   Mr. Dalen Lacks Standing to Seek Injunctive Relief.

Mr. Dalen lacks the standing to seek the instant injunctive relief not because he has

already been admitted for treatment, but because he has not suffered an injury in fact fairly

traceable to the Amended Act. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised

(May 24, 2016) (internal quotations omitted).  Neither the Complaint nor the Memorandum

tie any "concrete and particularized" injury to passage of the Amended Act.  *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).  Mr. Dalen's theory is apparently that

the Amended Act allowed his continued detention which, at some point, resulted in a violation of his constitutional rights.  FAC, ¶¶ 24-67.  However, all evidence shows that the Amended Act did not lengthen his detention, and Plaintiff points to no evidence whatsoever that he would have been admitted to a state-operated treatment program sooner but for the Amended Act's passage.  Stevens Decl., ¶ 48. For that reason, the Complaint should be dismissed and the motion denied.  *See* Defendant's Memorandum of Law in Support of Motion to Dismiss (ECF # 13), 6-7.

## II.  Mr. Dalen Has Not Established Any of the *Dataphase* Factors.

Even if the Court relied entirely on Mr. Dalen's unverified allegations and the cherry-picked excerpts from the legislative record, that "evidence" does not meet his high burden for the extraordinary remedy he seeks under any – much less all – of the *Dataphase* factors.

### A.  Mr. Dalen Is Not Likely to Succeed on the Merits.

Ordinarily, a party seeking an injunction can meet the "likelihood of success" *Dataphase* factor by showing only that they have a "fair chance of prevailing" on the merits.  *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  This fair-chance standard does not require the party seeking relief to "show 'a greater than fifty per cent likelihood that he will prevail on the merits.' " *Id*. at 731 (quotation omitted).  Because Mr. Dalen seeks to enjoin enforcement of a duly enacted statute, he faces "the more rigorous standard" to show that, on balance, he "is likely to prevail on the merits" *Id.*, 732.  This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic

16

processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* (quotation omitted).  Contrary to Mr. Dalen's assertion, this is a threshold that must be cleared before proceeding to the other *Dataphase* factors.[1]  *Id.* ("*If* the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court *should then* proceed to weigh the other *Dataphase* factors.") (emphasis added) (citing *Dataphase*, 640 F.2d at 113).

Nonetheless, Mr. Dalen does not present his theory as to why any claim is likely to succeed, instead simply incorporating his opposition to Defendant's motion to dismiss in lieu of argument on this issue.  MOL at 5-6 .  But that is insufficient because there is a gulf between what is required to survive a rule 12(b)(6) motion to dismiss and the heightened likelihood of success burden at issue here.  *See, e.g., Oglala Sioux Tribe v. U.S.*, No. 5:22-CV-05066-RAL, 2023 WL 3606098, at *3 (D.S.D. May 23, 2023) (contrasting the standards).  Perhaps most significantly, while Mr. Dalen's unsworn allegations are given deference in the context of a motion to dismiss, this deference does not apply to a motion seeking injunctive relief.  *Id.*; *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla.

---

[1] Mr. Dalen cites *Planned Parenthood Minnesota* for the opposite proposition.  MOL, 5-6 (arguing that "even without this factor, the remaining factors are so strongly in Plaintiff's favor and so uniquely pertinent in this case" the motion could be granted).  However, the language Mr. Dalen relies on for his argument comes from a survey of case law explicating the difference between the less rigorous "fair chance" standard and the more rigorous "is likely to prevail on the merits" standard that applies here.  *Planned Parenthood Minnesota*, 530 F.3d at 730-731 (laying out the history of the evolving standard).  In its holding, the court explicitly rejected Mr. Dalen's position that establishing likelihood of success is not a prerequisite to granting injunctive relief. *Id.* at 737 ("Given Planned Parenthood's failure to produce sufficient evidence to establish that it is likely to prevail on the merits of its compelled speech claim, we need not address the remaining *Dataphase* factors.").

2001), *aff'd*, 287 F.3d 1325 (11th Cir. 2002) ("A plaintiff seeking a preliminary injunction must offer proof beyond unverified allegations in the pleadings.")  Nonetheless, Mr. Dalen declined the opportunity to provide evidence to support his claims. .  And he presumably could have done so: as discussed below, Mr. Dalen's due process claims are premised on his personal experience of detention in Stearns County jail between May 24 and June 6, but he did not submit an affidavit in support of this motion.

### 1.    The Amended Act is not unconstitutional.

### a.    The Amended Act is not vague.

Mr. Dalen's claim that the Amended Act is unconstitutionally vague will fail because the act falls far outside the core concerns of the doctrine.  FAC, Count I. The vagueness doctrine is principally concerned with criminal prohibitions: "'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" *Washam*, 312 F.3d at 929 (quoting *United States v. Natl Dairy Prods. Corp*., 372 U.S. 29, 32–33 (1963)). The Amended Act falls outside this core concern because it is not a criminal statute, and it carries no threat of any sanction of Mr. Dalen based on his conduct.  Mr. Dalen offers only bare, implausible assertions that the Amended Act has operated to his detriment.[2]  No evidence supports that understanding of the statute.  *See* Stevens Decl., ¶ 48.  More to the

---

[2] The more plausible reading of the Amended Act is that it clarified the meaning of the priority admission act by explicitly describing what event starts that clock rather than substantively changing how the law was intended to be implemented.  *See Carlson v. Lilyerd*, 449 N.W.2d 185, 192 (Minn. Ct. App. 1989) ("We note that logically, defining a term that has already been used in a statute for several years should clarify rather than substantively change that statute.").

point, Mr. Dalen has identified no cognizable theory that the Amended Act sanctions any conduct whatsoever. *See* Defendants Reply Memorandum in Support of Motion to Dismiss (ECF 25), 3-4.

<b>b.      The Amended Act does not violate separation of powers.</b>

The Amended Act confers on DHS, part of the executive branch, the discretion to make a treatment determination in order to operate the agency in a manner consistent with the priority admission policy.  This does not violate separation of powers.  FAC, Count II. Nothing about the determination that a medically appropriate bed is available for a patient infringes on court process or the judicial power.  *State v. Lemmer*, 736 N.W.2d 650, 657 (Minn. 2007).  Mr. Dalen offers his own opinion that the length of time he spent on the waitlist transformed his admission for treatment into some other kind of determination. Oppn, 13-14.  But the evidence shows this to be false: the problem is not how DHS makes the determination, but that there are more individuals awaiting admission than available beds.  Stevens Decl., ¶ 24.  As Mr. Dalen's own history shows, whether an individual who has been civilly committed waits for treatment in jail or in the community remains entirely within the control of the court.  *See* Non-Cash Bond Posted, *State v. Dalen I*, (May 27, 2021) (Index #13) (providing for Mr. Dalen's conditional release pending civil commitment proceedings); Register of Actions, *State v. Dalen II*, (providing for release on payment of bail) (April 3, 2023).

Nor does the Amended Act confer legislative power. The Legislature can delegate details and process: "[W]hile the legislature must provide a 'reasonably clear policy'" that policy "'may be laid down in very broad and general terms.'" *Minnesota Auto. Dealers*

*Ass'n v. MPCA*, 986 N.W.2d 225, 232 (Minn. App. 2023), *review denied* (May 16, 2023)

(quoting *Lee v. Delmont*, 36 N.W.2d 350, 538-39 (Minn. 1949). Only the delegation of

"pure legislative power" or "the authority to make a complete law—complete as to the time

it shall take effect and as to whom it shall apply—and to determine the expediency of its

enactment" raises constitutional issues. *Id.* at 538. No "pure legislative power" is delegated

to Defendant by the Amended Act. Indeed, the Amended Act merely recognizes and makes

explicit what has always been a necessary a component of the priority admission process:

finding capacity to provide treatment to priority admission patients. *See, e.g.,* Stevens

Decl., ¶ 49.

### 2.     Mr. Dalen's substantive due process claims fail.

Mr. Dalen asserts that before amendment the correct reading of Minn. Stat.

§ 253B.10, subd. 1, required that priority patients be admitted for treatment within 48 hours

of their commitment order. Plaintiff's Memorandum of Law in Support of Motion for

Preliminary Injunction (ECF 28) ("MOL"), 1. Based on this reading, he urges this Court

to hold that the Amended Act, which explicitly ties admission to the availability of

treatment rather than the commitment order, cannot be implemented because it violates his

substantive due process rights. *Id.*, 1-2. But nowhere does Mr. Dalen identify a

constitutional principle that requires admission of a pretrial detainee for treatment within

48 hours of a commitment order.

Mr. Dalen cannot identify such a principle because substantive due process does not

protect any "right" to admission to a specialized mental health treatment facility within 48

hours of civil commitment. Substantive due process protects only those fundamental rights

and liberties which are, objectively, deeply rooted in the nation's history and tradition. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Indeed, it is well established in the Eighth Circuit that civilly committed individuals like Plaintiff has no *constitutionally* protected right to treatment. *Karsjens v. Piper*, 845 F.3d 394, 410 (8th Cir. 2017) (finding no "due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement").

Because there is no broader fundamental right at issue, Mr. Dalen attempts to string together a chain of inferences to argue that at some point his once-lawful incarceration became conscience-shocking or otherwise implicates some custodial protection flowing from the Fourteenth Amendment to pretrial detainees. *See* FAC, Counts III-VI. But Mr. Dalen has neither raised plausible allegations nor provided evidence to support an individualized claim that his detention in Stearns County jail shocked the conscience (Count VI). He has not provided evidence showing that he experienced an objectively serious medical need to which Defendant was deliberately indifferent (Counts III and VI). *Sorenson v. Minn. Dep't of Human Servs.*, No. 14-cv-4193, 2015 WL 251720, at *11 (D. Minn. Jan. 20, 2015). He has not provided evidence showing that the conditions of his detention at Stearns County jail were punitive (Counts IV and VI). *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). And he has not provided evidence showing that he was unreasonably restrained while detained (Counts V and VI). *Youngberg v. Romeo*, 457 U.S. 307, 319, (1982). In truth, Mr. Dalen makes no effort to introduce any evidence on these issues. His complaint contains no meaningful factual allegations relating to his treatment or the conditions of his confinement and, even if it did, the Complaint is not verified and does not

constitute evidence for this motion. *See, e.g.*, *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001), *aff'd*, 287 F.3d 1325 (11th Cir. 2002) ("A plaintiff seeking a preliminary injunction must offer proof beyond unverified allegations in the pleadings.").

Mr. Dalen has not established likelihood of success, and this motion should be denied on that basis alone.[3]  *Planned Parenthood Minnesota*, 530 F.3d at 737.

### B.  Mr. Dalen Provided No Evidence of Irreparable Harm.

Nor has Mr. Dalen proved that he is suffering or will suffer irreparable harm absent an injunction on operation of the statute. A "plaintiff has the burden of proving a clear showing of immediate irreparable injury." *Carlson v. City of Duluth*, 958 F.Supp.2d 1040, 1058 (D. Minn. 2013). To demonstrate a threat of irreparable harm, the harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal quotation marks omitted).

Mr. Dalen acknowledges that he is no longer detained and is currently receiving treatment as part of his civil commitment.  MOL, 3-4.  He has offered no evidence that he,

---

[3] In this response, Defendant does not recite every reason why Mr. Dalen's claims are likely to fail, and instead focus on the constitutional claims – which are the stated basis for this motion. ECF # 26 (seeking an injunction "on the ground that [the Amended Act] is unconstitutional"). Defendants respectfully request that the Court refer to Defendants' pending motion to dismiss for a more thorough explanation of the reasons these claims fail as a matter of law and for analysis addressing the deficiencies of the purported tort claims. *See generally* ECF #23.

personally, suffered any specific harm during his detention.[4]   Nor has he offered any

evidence to support his claim that "the Amendment removes any time limit by which the

Commissioner must admit committed individuals" subject to priority admission.  Oppn. 6.

To the contrary, all evidence shows that passage of the Amended Act did not result in any

change to the admission or waitlist processes for priority admission.  Stevens Decl., ¶ 48.

Instead of offering evidence that Mr. Dalen himself is suffering or threatened with

suffering irreparable harm because of the Amended Act, Plaintiff's Memorandum relies on

the legislative history of the passage of the original priority admission language in 2013.[5]

MOL, 7-8.   This testimony cannot support the extraordinary requested relief.   Judge

Quam's 2013 testimony addressed the policy concerns that led to passage of the priority

admissions law.  MOL. 7.  It falls well short of establishing that the admission process

violated anyone's Constitutional rights before the priority admissions law went into effect

---

[4] Mr. Dalen has not yet moved for class certification, and he does not explicitly seek class-wide injunctive relief.  Motion, ECF # 26.  Moreover, Mr. Dalen's theory that Amended Act violates the Constitution is premised on his claim that at some point his otherwise lawful detention became unconstitutional due to the delay in admission to a state-operated facility.  *See* FAC, ¶¶ 36-67.  This individualized theory of constitutional violation, even if accepted, cannot support an inference that every application of the Amended Act violates the Constitution.  *See Chairse v. Dep't of Hum. Servs.*, No. 23-CV-355 (ECT/ECW), 2023 WL 5984251, at *3 (D. Minn. Sept. 14, 2023).  For example, had Mr. Dalen elected to provide evidence regarding the conditions of his confinement in Stearns County jail, that evidence would have no direct bearing on the conditions in other county jails.

[5] The MOL also implies that if this Court accepts that Mr. Dalen has sufficiently alleged a violation of his constitutional rights, that alone would satisfy this *Dataphase* element. MOL, 7.  But the law is clear that violations of constitutional rights do not necessarily or inherently constitute irreparable harm. *See Let Them Play MN v. Walz*, 517 F.Supp.3d 870, 887 (D. Minn. 2021) (collecting cases holding that a constitutional violation is not coextensive with irreparable harm).

10 years ago, and it does absolutely nothing to show that the Amended Act has done so in the five months since it was enacted.  To the contrary, Plaintiff's approach suggests what is true: that whether or how to direct priority admissions is a matter of legislative discretion subject to policy debate within that branch of government, and not a constitutional issue.

Because Mr. Dalen has failed to prove that he will suffer irreparable harm absent an injunction, his motion must be denied. *Sessler v. City of Davenport, Iowa*, 990 F.3d 1150, 1156 (8th Cir. 2021) (failing to show irreparable harm is by itself reason to deny a preliminary injunction).

### C.     Public Policy Favors Giving Effect to Duly Enacted State Law.

Public policy favors following state law and judicially recognized interests. *Dahlberg Bros.*, 137 N.W.2d at 322 (noting public policy is "expressed in the statutes"); *Phipps v. Clark Oil & Ref. Corp.*, 396 N.W.2d 588, 593 (Minn. App. 1986), *aff'd*, 408 N.W.2d 569 (Minn. 1987) (public policy is derived from "clear mandates of legislative or judicially recognized public policy").[6]

The conception of "public policy" Mr. Dalen advances in his MOL has no basis in fact.  He presents the policy purposes of the pre-amendment priority admission act and the Amended Act as diametrically opposed—because the 2013 passage was good, the

---

[6] It is worth noting that Mr. Dalen did not dispute that the Amended Act was properly enacted.  MOL, 9-13.  Mr. Dalen offered no evidence supporting his unpled assertion that the Amended Act improperly "targeted" Mr. Dalen and members of the putative class or was otherwise "procedurally defective."   *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss (ECF # 22) at 26-27.  The facts show that the Amended Act was passed in the ordinary course, with extensive hearings and public input.  Briones Decl., ¶ 3 (noting that at least 13 hearings were held, including three that included public comment).

Amended Act is bad.  MOL, 9-13.  All evidence is to the contrary—both versions serve the purpose of prioritizing the admission of people who are detained or incarcerated for treatment pursuant to their civil commitment.[7]  The relief Plaintiff seeks would do nothing to advance this cause: enjoining implementation of the Amended Act would not add beds or staff to AMRTC.  Even if Mr. Dalen's incorrect construction of the pre-amendment act (as mandating admission within 48 hours *of civil commitment*) were accepted, the reality of limited space and staff would persist.[8]

### D. The Balance of Harms Favors Denying an Injunction.

When considering the balance of harm on a motion for a preliminary injunction, "[t]he goal is to assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Sup.3d 854, 875 (D. Minn. 2015) (citation omitted).  In assessing a motion for a temporary injunction in order to maintain the status quo, courts must consider, "[t]he harm to be suffered by plaintiff if the temporary restraint is denied as

---

[7] Plaintiff's argument is also wrong on the law.  The State of Minnesota has the right to reverse public policy and amend its laws accordingly.  *Meriwether Minn. Land & Timber, LLC v. State*, 818 N.W.2d 557, 566 (Minn. App. 2012) (stating that "any promise to be found in a statute is inherently limited by the legislature's power to amend a statute").

[8] Mr. Dalen attempts to dismiss DHS's fiscal constraints an excuse rather than a reason, but DHS is a government agency limited to spending funds as they are allocated.  *See* Glancey Decl., ¶ 2.  Mr. Dalen also paints the goal of reducing litigation against the state as somehow illegitimate or corrupt.  MOL, 12-13.  However, as Attorney General Ellison testified, DHS has faced over 17 individual actions on this statute in the past five years, *SF2934 - Public Testimony on the Human Services Finance Omnibus Bills, before the Senate Conference Committee*, 93d Leg. Sess., at 9:40.  None of these actions changed the reality that admission for treatment of mental illness requires capacity to provide that treatment.  Stevens Decl., ¶ 49.

compared to that inflicted on defendant if the injunction issues pending trial." *Dahlberg*

*Bros.*, 137 N.W.2d at 321.

As discussed above, the specific relief sought—enjoining implementation of the

Amended Act—would not alter the priority admission process because that process was

not changed by passage of the act and was proper under both versions of the statute.  For

this reason and because he has already been admitted, the absence of an injunction would

not harm Mr. Dalen (or anyone else) at all.  Granting an injunction, however, would

substantially infringe upon the state's ability to make its own policy judgments through

legislation.  *Planned Parenthood Minnesota,* 530 F.3d at 732.  Accordingly, Plaintiff fails

to demonstrate that the balance of harms favors the injunction he requests.[9]

### CONCLUSION

Plaintiff's motion for preliminary injunction should be denied.

---

[9] The balance of harms would not favor him even if Mr. Dalen had not already been admitted and had asked for an injunction mandating admission within 48 hours of a commitment order.  Such an injunction—which would apparently require admission of patients to facilities that are full, not medically appropriate, or both—would disrupt the status quo in a manner that would create chaos harming not only Defendant, but also Plaintiff, all other putative class members, the other individuals served in treatment facilities, and the treatment staff of those facilities. *See* Stevens Decl. ¶ 9 ("Admitting more patients than can be safely served given patient acuity, milieu acuity, anticipated patient needs, physical plant limitations, staffing limitations, and regulatory requirements puts existing patients and new patients, as well as staff, at significant risk."), ¶ 52 (explaining that admitting 58 or more new patients would put DCT programs in violation of numerous legal and regulatory standards and would result in an unsafe situation).  This would *reduce, not increase* Defendant's capacity to provide treatment because the licensing and certification violations that could result from such an injunction Plaintiff would threaten the entire existence of the hospitals.

Dated: October 2, 2023                    Respectfully submitted,

                                          KEITH ELLISON
                                          Attorney General
                                          State of Minnesota


                                          **s/ Leaf McGregor**
                                          LEAF MCGREGOR
                                          Assistant Attorney General
                                          Atty. Reg. No. 0389140

                                          AARON WINTER
                                          Assistant Attorney General
                                          Atty. Reg. No. 0390914

                                          445 Minnesota Street, Suite 1400
                                          St. Paul, Minnesota 55101-2131
                                          (651) 757-1258 (Voice)
                                          (651) 282-5832 (Fax)
                                          leaf.mcgregor@ag.state.mn.us
                                          aaron.winter@ag.state.mn.us

                                          *Attorneys for Defendant*

#5587584-v1