UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Kyle Jerome Dalen,                                    Case No. 23-cv-1877 (ECT/ECW)

                            Plaintiff,

        vs.                                                  **DECLARATION OF**
                                                      **KYLEEANN STEVENS, M.D.**

Jodi Harpstead, Commissioner of the
Minnesota Department of Human
Services, in her individual and official
capacities,

                            Defendant.

I, KyleeAnn Stevens, M.D., state as follows:

1.      I am a forensic psychiatrist employed by the Minnesota Department of

Human Services as the Executive Medical Director for Behavioral Health.  As the

Executive Medical Director, I oversee care and treatment at all of DHS' treatment

programs which are within the Direct Care and Treatment (DCT) division of DHS.

2.      One of my primary duties as Executive Medical Director is to oversee and

approve the admission of civilly committed individuals to DCT facilities.  This includes

admissions to the Anoka Metro Regional Treatment Center (AMRTC) and Community

Behavioral Health Hospitals (CBHHs), all of which are part of DCT's Mental Health and

Substance Abuse Treatment Services (MHSATS) division.

3.      AMRTC and the CBHHs are licensed by the Minnesota Department of

Health as hospitals and are subject to regulation by the federal Centers for Medicare

and Medicaid Services (CMS)  as  well  as  other  regulatory  bodies,  such  as  the

Occupational Safety and Health Administration (OSHA) and the federal Department of Health & Human Services' Office for Civil Rights.

4.    AMRTC is a psychiatric hospital that serves primarily civilly committed patients with highly complex medical conditions and who may exhibit volatile behaviors. These patients typically cannot or will not be treated at community hospitals that may lack the necessary clinical expertise, safe facilities, and sufficient support staff.

5.    DCT's six CBHHs are small, 16 bed psychiatric hospitals that serve primarily civilly committed patients. While CBHHs are also hospitals and the treatment offered at them is generally not different than that offered at AMRTC, the tools and capacity available in a CBHH to manage aggressive patients are substantially different, given the physical environment and staffing levels at CBHHs. CBHHs are not equipped for high acuity treatment interventions such as repeated restraint and seclusions, or for highly destructive patient behavior. Additionally, the CBHHs are less secure than AMRTC.

6.    DHS has not been appropriated funding from the legislature to build and staff more adult psychiatric hospitals to provide services in DCT. At this time, no funds have been appropriated by the legislature to build additional space for beds and hire more staff to care for additional patients beyond the current capacity at AMRTC.

7.    Prior to 2016, the CBHHs were not budgeted to operate at their full physical bed capacity. In 2016, DHS requested and received funding from the Legislature to operate the CBHHs at full capacity. Today, the CBHHs operate at full capacity and can serve medically appropriate priority admissions, as described above.

2

In 2016, DHS also requested and received over $2 million for staffing needs at AMRTC.

*Admissions to DCT Programs*

8.      As Executive Medical Director, admission decisions are made under my authority, with significant and regular input from program medical directors and clinical leadership. Admission decisions are ultimately medical decisions and the decision about whether AMRTC or a CBHH can properly provide services for any given referral is a medical decision. In accordance with DCT policy and CMS regulations, all patients must be admitted to DCT hospitals under the care of a physician.

9.      A physician can only admit a patient to a hospital if that hospital is capable of safely serving that patient and others. Admitting more patients than can be safely served given patient acuity, milieu acuity, anticipated patient needs, physical plant limitations, staffing limitations, and regulatory requirements puts existing patients and new patients, as well as staff, at significant risk. Regulatory sanctions that could result from admitting more patients than can be safely served could result in DCT hospitals losing CMS certification or MDH licensure.

10.     For example, in 2016, CMS subjected AMRTC to a "Systems Improvement Agreement" following an immediate jeopardy licensing sanction that resulted, in part, from circumstances exacerbated by high admission rates, acuity of patient admissions and resulting patient safety concerns. As I understand it, a Systems Improvement Agreement is a very serious, last chance mechanism for a hospital to avoid CMS termination. Thus, it is critical that admissions and census are tightly managed to

ensure necessary care can be provided safely.

11.    The admissions process described below is utilized for every priority admission referral that DCT receives.

12.    DCT reviews and evaluates admissions referrals through its highly trained Central Preadmissions (CPA) team, which reports to me.  The staff of CPA primarily consists of registered nurses, social workers, licensed alcohol and drug counselor, and other trained staff, who do initial triage for admissions to DCT programs. CPA staff work 24 hours a day, 7 days a week to keep DCT beds filled.

13.    Following receipt of court orders that include a referral under Minnesota Statutes § 253B.10 (the priority admissions law), CPA staff gather information from the jail where the person is located, including jail logs, incident reports, jail medical information and a verbal report from jail staff.  In many cases, CPA will also have contact with the referred individual's county case manager to obtain additional information and facilitate ongoing communication.  If available and known to DCT at the time of referral, CPA staff may also contact other community health care providers or facilities that have served the individual in the recent past to request records, as allowed by law.

14.    For any priority admission, CPA minimally must receive records from the holding jail in order to be able to screen an individual for DCT admission and move them forward for placement assessment by a physician.  In some cases, CPA receives these records very quickly upon their initial request and in other cases they must repeatedly follow up with a jail or days may pass before CPA actually receives that

information.

15.     If CPA's initial screening suggests AMRTC as the best placement option, the priority referral is then sent to AMRTC medical leadership for review of that referral's individual needs.  For example, factors such as whether the individual requires an all-male unit due to problematic sexual behaviors, reduced opportunities for interaction with peers, increased supervision needs, and the present patient mix on a particular unit are considered.  An individual's history of aggression and its context factor significantly into placement decisions as well. Civil commitment as a person who has a mental illness and is dangerous to the public (MI&D) is an exclusionary factor for admission to AMRTC.

16.     CPA staff simultaneously screen priority referrals for possible placement at a CBHH.  Priority referrals that are committed as a person who has a mental illness and is dangerous to the public (MI&D), are recently aggressive, are unwilling to accept psychotropic medication, have a criminal sexual history, are currently in segregation due to safety concerns, or who have current criminal charges related to weapons or assault are generally not appropriate for CBHH placement and will not be referred to a CBHH. Individuals demonstrating aggression or aggression toward health care workers or authority figures such as law enforcement also generally cannot be safely managed in a CBHH setting.  If it is not clear to which hospital level program the referral should be sent, a priority referral is sent to the AMRTC Medical Director and the CBHH Medical Director for further clinical assessment and direction.  If a referral decision is not resolved at that level, the MHSATS Medical Director or I provide direction.

17.    If a priority referral to DCT does not appear to require hospital level of care and is not civilly committed as MI&D, CPA staff will discuss the referral with medical leadership and consider whether referring the person to a DCT residential facility (such as a Community Addiction Recovery Enterprise (CARE) program or Minnesota Specialty Health System (MSHS) program) or community placement is appropriate. If the county has found a community placement for a priority referral, they can request that DCT remotely provisionally discharge the person directly from jail to the community placement, with approval of the MHSATS medical director.

18.    DCT maintains a priority admission waitlist at this time. The priority admission waitlist is ordered by date and time that an individual's priority referral order is received by CPA. An individual may be admitted "out of order" from this waitlist if a bed becomes available in a program or on a unit that individuals closer to the top of the waitlist are not clinically appropriate for.  For example, if a female referral is number one on the priority waitlist but the next available bed is on an all-male unit, the next male referral on the priority wait list would be admitted in front of the female referral.

19.    CPA staff offer coordination of clinical consultation for jails while admissions are pending on the waitlist.  The staff in that office are available 24 hours a day, seven days a week and can provide a bridge to DCT providers for consultation and advice.

20.    While individuals are on the priority waitlist, CPA staff periodically reach out to the jails to receive updated records and information on the individual's status.  If the updated information suggests an individual's presentation or needs have changed

such that they may be able to be safely served at another program, for example a CBHH instead of AMRTC, CPA staff will forward those updated records to appropriate medical leadership for an updated review.

21.     CPA staff also accept updates at any time when they are offered by jail staff, county case managers, or other interested persons while an individual is on the priority waitlist.  It is not uncommon for jail or county staff to proactively reach out to CPA to share information.

22.     CPA staff have been specifically told by some county jails and jail staff to stop calling the jail for updates until a DCT bed is available.

23.     AMRTC and CBHH staff communicate in advance to CPA staff about planned discharges so that CPA staff can proactively work to prepare the next admission to arrive as soon as possible after a discharge occurs, with the goal of not leaving beds open for even a single day whenever possible.  CPA staff also notify the jail and case manager of the expected admission date for referrals close to the top of the waitlist so that the referral is admitted within 48 hours of a medically appropriate bed becoming available.  At times new admissions do not arrive within this time period for reasons outside of DCT's control, such as law enforcement not transporting an individual to a DCT program for admission for several days beyond when admission was available.

24.     DCT's referral population has become increasingly more challenging and complex over the past eight years, and specifically has grown to include significantly higher numbers of individuals admitted directly from jails.  Between 2014 and 2022, admissions under the priority admission law increased 247% percent.

a. In 2014, DCT admitted 113 people under 253B.10.

b. In 2015, DCT admitted 153 people under 253B.10.

c. In 2016, DCT admitted 168 people under 253B.10.

d. In 2017, DCT admitted 231 people under 253B.10.

e. In 2018, DCT admitted 289 people under 253B.10.

f. In 2019, DCT admitted 258 people under 253B.10.

g. In 2020, DCT admitted 260 people under 253B.10.

h.  In 2021, DCT admitted 323 people under 253B.10.

i. In 2022, DCT admitted 393 people under 253B.10.

*DCT Treatment Capacity & Issues Impacting Capacity*

25. As at any hospital, treatment capacity at AMRTC is dependent on numerous factors and requirements and is governed by rules of CMS, MDH, and a myriad of additional regulations. On any given day available treatment bed capacity varies, depending on the acuity of the current patients as well as the anticipated needs of referred individuals, and other variable factors such as COVID-19 cases, physical plant issues, etc.

26. High acuity patients (patients who are experiencing severe or volatile symptoms of their mental illness) require more physical space, separation from other patients, privacy, and a higher staff-to-patient ratio, all of which can impact and reduce overall treatment bed capacity at a hospital, including DCT hospitals. At AMRTC, patients with these complex needs or aggressive or challenging behaviors may require Intensive Care Areas (a section of a unit that can be physically closed off from the larger

8

unit to provide a smaller and safer treatment area with dedicated staff always present for a patient with acute needs) or Low Stimulation Environments (a section of a unit where stimulation such as lights, sounds, etc. can be controlled and limited) to address their medical needs, both of which limit the number of beds available for other patients. Patients are often unable to safely share rooms with a roommate, which reduces the number of beds available.

27.     Other factors also directly and significantly impact DCT program bed capacity and admissions timelines, including discharge delays for current patients; lack of community placement options; lack of funding for additional capacity; staffing shortages; changes in the patient population; and COVID-19 disruptions.  DCT has taken a wide variety of steps over the years to address these challenges including early discharge planning for current patients; increasing coordination with external stakeholders such as counties to streamline admissions and discharges; assessing referrals for placement at CBHHs or other DCT programs; legislative efforts; diversion efforts for referrals who do not require the level of care provided at DCT; enhanced staffing recruitment and retention strategies, and realigning discharge criteria in 2018.

28.     DCT can't admit new patients – even priority admissions patients – until we can discharge patients who no longer need our care.  When current AMRTC or CBHH patients who no longer require a hospital level of care cannot be promptly discharged, those delays directly impact program admissions because they result in patients who do not need the level of care provided by the facility where they reside remaining in that facility for longer than is medically necessary, rendering those beds unavailable to individuals who do

require that level of care.

29.     In recent years, a high percentage of patients at AMRTC no longer required hospital level care but were not able to be promptly discharged.  For example, in the first two months of calendar year 2023[1], AMRTC averaged nearly 45 (44.89 specifically) patients per day who did not meet medical criteria (DNMC) to be in a hospital setting.  To demonstrate the direct and significant impact this has on AMRTC admissions, if the average daily number of patients that remain after they are ready for discharge and no longer need a hospital level of care is 45 per day, over a year's time this equals 16,425 patient days (45 x 365 = 16,425 patient days).  The current average number of days patients reside at AMRTC for clinically appropriate treatment is 74 days.

30.     DCT can't discharge current patients until counties have arranged appropriate community placements for them.  Under Minnesota law, counties are tasked with establishing, coordinating, and monitoring plans for an individual provisionally discharged under a civil commitment, including coordination of necessary support services.  As such, county case managers are integral to the discharge planning process, and generally, discharge planning cannot go forward if the county does not actively participate or agree to fund the community placement and ongoing treatment needs for the patient.

31.     When a person is admitted to a DCT facility, discharge planning for that specific person begins on the same day to avoid discharge delays.  This planning involves

---

[1] Specifically, from January 4, 2023, to February 28, 2023.

the patient, treatment team, county case manager, and family or guardian. Counties are invited to be an active participant throughout the entire discharge planning process, and DCT sees varying degrees of county participation in the person-specific discharge planning process. For example, DCT participates in weekly meetings with Ramsey County to triage discharge and diversion planning for multiple patients generally across their systems, meets with both Hennepin and St. Louis counties several times per month, as well as other counties as needed, to engage in joint discharge planning and diversion efforts where appropriate.

32.     DCT also has a transitions team that actively works to both divert referrals from DCT facilities when clinically appropriate prior to admission and to decrease the number of days patients remain in DCT facilities after being assessed as no longer requiring the level of care provided.

33.     DCT is continually working to improve both relationships with county partners and communications from its treatment facilities to county partners regarding discharge planning, with the goal of improving the flow and pace of the discharge planning process.

34.     Discharge delays may result from a variety of reasons, but typically the most common cause of a discharge delay is a lack of community placement for the person or a lack of an available bed at the Forensic Mental Health Program. Other reasons include that the county has not secured necessary funding for a community placement and community providers who are unwilling to serve individuals discharging from DCT, who often have intensive psychosocial needs or criminal justice history.

35.     Finding community-based discharge placements is currently a significant challenge for county case managers and therefore for DCT programs.  This is not a problem unique to DCT, as hospitals and emergency rooms across Minnesota are currently experiencing this same challenge.

36.     Minnesota is currently experiencing a notable shortage of community-based care providers, such as group homes, adult foster care homes, and Intensive Residential Treatment Services (IRTS) programs.  Relatively few DCT patients, and particularly those discharging from DCT's highest levels of care, can discharge to their own homes.  A large number of individuals discharging from AMRTC or the CBHHs require a community-based care setting and the ongoing shortage of these options in the community has led to significant backups in DCT hospitals.

37.     Additionally, many community-based providers are not willing to serve patients with complex mental health and behavioral issues, who make up the majority of the population DCT serves.  Some providers are unwilling to accept individuals with intensive psychosocial needs, chemical health needs, criminal justice system involvement, and housing instability.  This further constricts community-based placement options and leads to discharge delays.

38.     Despite their best efforts, in many cases county case managers are not able to promptly secure a community-based placement for individuals at AMRTC or the CBHHs who require that level of step down care.  This leads to these patients remaining at DCT programs beyond when they are ready for discharge and directly prevents DCT from admitting individuals off the priority waitlist.  For example, in a recent case an

individual civilly committed in ▮▮▮▮ County remained at AMRTC for more than 40 days beyond the date they were determined to no longer require hospital level of care, as a community discharge placement could not be timely secured despite diligent efforts by both county case management and AMRTC staff.

39.     Indeed, in most cases, counties are making efforts to find appropriate placements for patients ready for discharge from DCT programs, but there are simply not enough community providers to meet the current demand.  Without an increase in community-based providers, discharge delays will remain, counties will not be able to secure community placements, and DCT program beds will continue to be occupied by individuals who no longer need that level of care.

40.     DCT is just one part of a much broader spectrum of mental health services in the state of Minnesota.  Disruptions or challenges in other parts of this spectrum, such as community-based services capacity, can and do have a ripple effect on DCT program operations and particularly on capacity.

41.     Treatment capacity isn't just measured in the number of physical beds at a facility.  A health care program also must have the right number and mix of highly trained and skilled staff. DCT has experienced significant staffing shortages over the past three years.  Like many health care systems in Minnesota and nationwide, DCT has struggled to recruit and retain personnel, especially highly skilled nurses and many other direct care staff who care for, assist, and monitor DCT's unique patient population.  Currently, even if DCT had additional money appropriated from the Legislature to build new programs, DCT likely would not be able to recruit and hire sufficient staff to operate

those programs.

42.     Since 2020, at various times DCT has had to limit patient census at many facilities due to a lack of staff.  Without full staffing capacity, DCT cannot operate at a program's full bed capacity, even if there were no other capacity limiting factors present, such as high patient acuity. Treatment capacity is also diminished when current patients are highly symptomatic, aggressive or have challenging behaviors that require very close monitoring.  In such cases, it may be necessary to assign double, triple or quadruple the staff to attend to each of those patients.  This limits the number of patients DCT can safely admit and treat.

43.     To help alleviate staffing shortages that were exacerbated by the pandemic, DCT enhanced its recruiting and retention efforts system-wide, offering retention and hiring bonuses in an attempt to backfill vacant positions.  Shift bonuses were also offered in some facilities to compensate existing employees for covering shifts with low staffing levels.

44.     In the recent past, DCT also took steps to address patient retention related barriers to increase admission capacity.  At the end of 2018, DCT aligned its discharge criteria with psychiatric stability so that patients clinically appropriate for discharge were provisionally discharged, even if they were still subject to an incompetency finding in a criminal proceeding. This decision was made specifically as a result of DCT's recognition that retention of patients who were incompetent to stand trial but otherwise psychiatrically stable was creating a significant barrier to admission for individuals who needed the level of care provided by AMRTC.  This shift, though controversial with many

of our stakeholders, allowed AMRTC, for example, to notably increase its admissions. In 2018, AMRTC admitted 270 total patients; in 2020, two years after the realignment, AMRTC admitted 355 total patients, an increase of more than 30%.

45.     The COVID-19 pandemic and related disruptions have also had a significant impact on DCT's ability to admit priority referrals.  The waitlist for priority admissions grew at an unprecedented rate during the height of the COVID-19 pandemic.  Since October of 2020, periodic COVID-19 outbreaks have forced DCT to stop admissions to individual CBHHs as well as to multiple treatment units at AMRTC often for weeks at a time for those programs to comply with isolation and quarantining requirements of the Centers for Disease Control and MDH.  During this same time period, there have been months when three or four out of six treatment units at AMRTC were unable to accept new admissions due to COVID-19.

46.     AMRTC and the CBHHs are not general hospitals—they do not have emergency departments and cannot provide many of the clinical services that are standard at a general hospital, due to the unique population they serve as well as due to the safety considerations that come along with that population.  As they are not general hospitals, DCT hospitals cannot continue to admit new patients to impacted units when there is a COVID-19 outbreak among patients.  Doing so would be akin to a general hospital admitting patients in need of cardiac care to a COVID-19 treatment unit—unnecessarily exposing those vulnerable individuals to COVID-19.

47.     As of September 28, 2023, all the available beds at AMRTC were filled with patients, and all the available beds across CBHHs were either filled with patients or

scheduled for a new patient admission. DCT also operates the residential facilities CARE and MSHS, which may serve a very small number of people on the priority admission waitlist in cases where it is medically appropriate. As of September 28, 2023, CARE and MSHS programs were at or near full capacity. All medically appropriate beds available for priority admissions were currently full or otherwise scheduled to take admissions.

48.     Neither the admissions nor the waitlist procedures described above changed as a result of the amendment to the priority admissions law in May 2023.

49.     As a medical doctor and the Executive Medical Director, my goal is to provide high quality, person-centered care to every Minnesotan who needs treatment in a state-operated program.  I would very much prefer that DCT could immediately provide a medically appropriate bed to every person who needs one and could expeditiously discharge every individual in our care to an appropriate step-down location when they no longer require our care.  However, in practice it is simply not possible to do either of these things at this time given the resources appropriated to DHS, the state and nation-wide health care worker shortages, the limited number of community discharge options available, and other factors discussed above.  Under these circumstances, I have no choice but to triage referrals to DCT and utilize waitlists for admission.  Individuals that fall under the priority admissions law are consistently and intentionally prioritized ahead of other admissions, even when waitlists for priority admission are necessary.  DCT continues to diligently work to safely admit as many patients as we can, as quickly as we can.

50.     In November 2022, Mr. Dalen was civilly committed to the Commissioner of Human Services and the head of a Minn. Stat. 245G treatment facility.  He was not in custody at that time. █████████████████████████████

████████████████████████████████████████████████████

███████████████

51.     In May 2023, Mr. Dalen's civil commitment was continued. At that point, Mr. Dalen was in the custody of the Stearns County Jail and was eligible for priority admission under Minn. Stat. 253B.10. ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████

52.     As of September 28, 2023, there were 58 individuals on the priority admission waitlist.  DCT does not have sufficient licensed, funded, and staffed beds to immediately admit all individuals currently on the priority admission waitlist. For example, each CBHH is specifically licensed to operate 16 hospital beds. Admitting more than 16 patients to any of those facilities would put those facilities in immediate violation of their hospital licensure. Moreover, there are quite literally only 16 patient beds in each CBHH. There are simply no more physical beds in which additional patients could be placed.

53.     The only means by which DCT programs could admit 58 or more new patients immediately or imminently would be to either 1) immediately discharge 58 or more patients likely without a discharge plan and without identified community housing, or 2) admit more patients than DCT programs can appropriately serve under applicable licensing, regulatory, and legal standards. It is my belief that either of these actions would result in DCT programs being out of compliance with numerous licensing, regulatory, and other applicable legal requirements which in turn would threaten the ongoing licensure or existence of those programs.

54.     In addition to placing DCT programs in immediate risk, I believe either above situation would also jeopardize the licensure of DCT physicians and other licensed staff and place them, as well as potentially hundreds of other DCT direct care staff, at risk of being subject to findings of maltreatment or neglect of patients, rendering them ineligible to provide direct care.

55.     In my professional judgment, deviating from current admission processes in the manners described above would result in an unsafe and unethical situation where medical professionals are not directing admissions to hospitals and other treatment programs, in contradiction to applicable regulatory standards.

56.     In my professional judgment, there is no safe, viable, or legally/regulatory compliant means by which DHS can immediately or imminently admit 58 or more individuals to its inpatient or residential programs.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

*s/ KyleeAnn Stevens*_____
KYLEEANN STEVENS

Executed on October 2, 2023
Scott County,
State of Minnesota