UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Kyle Jerome Dalen,<br>　　　　　　　Plaintiff,<br><br>vs.<br><br>Jodi Harpstead, Commissioner of the<br>Minnesota Department of Human Services,<br>in her individual and official capacities,<br><br>　　　　　　　Defendant. | Case No. 23-cv-1877 (ECT/ECW)<br><br>**DECLARATION OF LYNN<br>GLANCEY** |

I, Lynn Glancey, hereby declare as follows:

1.　　I am the Interim Chief Financial Officer (CFO) for the Department of Human Services' (DHS) Direct Care & Treatment (DCT) division. I report to the DHS Chief Financial Officer. I have held my current position for approximately 7 months. Prior to my current position, I served as DCT Budget Manager for approximately 7 years.

2.　　All of DCT's funding is provided by the Legislature through appropriations, other than limited enterprise services[1] who can retain their income from billed services to self-fund their operations. None of the DCT hospitals, including the Anoka Metro Regional Treatment Center and the Community Behavioral Health Hospitals, are enterprise services.

3.　　The DCT hospitals receive a direct appropriation from the Legislature.

---

[1] DCT enterprise services consist of Community Health Clinics and the Minnesota State Operated Community Services.

4.  Payments collected by DCT hospitals through billing for patient care are required to be placed in the state's General Fund. DCT does not retain any of these funds and has no direct access to use them. The Legislature controls and directs how money in the General Fund may be spent.

5.  DHS and DCT are obligated to spend money that is appropriated for specific purposes or programs on those items.

6.  Funding appropriated for the operation of one DCT program could be transferred to operate another DCT program, however in order to make such a transfer the sending program would have to be downsized, suspended or closed. In other words, the funding would only be available to transfer if the sending program reduced its current admission capacity or ceased operating entirely, there are not extra appropriated funds available at any DCT program for redistribution. A transfer of this nature would require the approval of the Minnesota Management and Budget Agency (MMB) and would require notification of the transfer to the Legislature.

7.  In the past, in limited instances where excess funds have existed in one part of the DCT budget, members of the legislature have objected to DCT funds transfers.

8.  The Legislature also has the authority to specifically direct what purposes transferred funds may be used for and the authority to revoke DHS' authority to internally transfer funds altogether.

9.  Financially downsizing DCT programs results in DCT being able to serve fewer clients at those programs.

10. DCT cannot unilaterally close the programs it operates. Under state law, closing DCT programs minimally requires notification to the Legislature and for any non-enterprise program, unless DCT can obtain agreement from all impacted labor unions regarding impacted employees, requires permission from the Legislature.

11. A DCT building project, including both construction of new program buildings and expansion or renovation of existing program buildings, must be funded by the Legislature through the capital projects process.

12. The preferred process for obtaining a capital project bill is to first seek what is known as "pre-design" along with construction costs. Pre-design funding is intended to cover up-front costs for things like estimates, assessments, and guarantees that the intended building type would be possible on the proposed location.

13. If the Legislature appropriated pre-design funding to DCT, it would generally take around nine to twelve months to complete pre-design work. DCT would also have to include estimates for the operational funds needed to run the program itself once constructed. Pre-design and other capital project money for building projects do not cover operational costs.

14. If the Legislature approved a DCT capital project construction request, DCT could then begin seeking design proposals for actual construction. Based on my knowledge and experience, construction of a new DCT program building requires a minimum of two to three years from the time the funding is received from the Legislature to when a program building is completed and able to admit clients. Renovation and expansions are usually phased and can take up to five years to complete.

15. An agency can request bonding money from the Legislature without first seeking pre-design funding, but in that circumstance there is risk of having to return to the Legislature to ask for additional building funds, because there is no actual estimate of costs available.

16. DCT cannot take existing appropriated operating funds and use those funds for construction of new program buildings or expansion or renovation of existing buildings without specific legislative authority. Money for these types of construction work must go through the capital projects process, even if DCT were to propose using existing appropriated operational funds for that purpose.

17. In some situations, DCT may have the option to contract with an individual or entity in the community to build a facility which DCT would then lease for program use. This contracting process generally takes around a year to complete prior to any construction work beginning. DCT would need an appropriation from the Legislature to pay for this lease, any related contract costs, and the operating costs for such a program.

18. It is not uncommon for DCT to request pre-design or other capital project funding from the Legislature and not receive it.

19. For example, over the last five years, DCT has repeatedly attempted to obtain capital project money specifically to build additional patient bed capacity in the Miller Building, which is a building located on the campus of the Anoka Metro Regional Treatment Center, though it is separate from the hospital itself. During both the 2020 and 2022 legislative sessions, DCT specifically asked the Legislature for funds for this purpose.

20. This request was intended to create new supervised living facility licensed beds in the Miller Building to increase DCT's overall capacity to serve clients. It was not, however, intended to take individuals who otherwise meet criteria for an AMRTC bed.

21. In both 2020 and 2022, bills were put before the Legislature seeking this funding and the Legislature did not pass them. DCT cannot engage in construction work to add capacity to the Miller Building without capital projects money from the Legislature.

22. Over the last three years, DCT has experienced significant and ongoing staffing shortages.

23. During most of calendar year 2022, DCT offered shift bonuses to compensate staff for covering open shifts that resulted from high staff vacancy rates. The funding for these shift bonuses came from DCT program salary appropriations. Because DCT has had such high staff vacancy rates and has therefore not been paying salary costs for those vacant positions, these funds were available and could be used for compensation purposes for existing staff, such as shift bonuses. In other words, if DCT programs had been staffed at their normal and intended rates during this time period, these funds would not have been available to be used for shift bonuses.

24. As another means of trying to address staffing shortages, over the last two years, DCT has offered referral and retention bonuses as a means to retain existing staff and attract new staff to fill vacancies. Such bonuses have previously not been offered by DCT at the rates and frequency they have been in the last two years, which was a direct response to the degree of this staffing shortage. These bonuses were also funded through existing DCT program salary appropriations as described above.

25. These types of bonuses must be negotiated with labor unions and approved by MMB. DHS and DCT do not have independent authority to provide these bonuses without the agreement of those entities.

26. Despite efforts to recruit and retain staff, DCT continues to have unfilled staff positions. AMRTC's overall vacancy rate for full-time equivalency (FTEs) as of September 22, 2023 was 19.7%. The vacancy rate for unit staff (Human Services Technicians, LPNs, Mental Health Program Assistants, RNs, and Security Counselors) at AMRTC was 21.6%, meaning 57 positions were unfilled; there was also one unfilled psychiatrist position, which results in a vacancy rate of 25% for psychiatrists at AMRTC. The overall vacancy rate for FTEs across CBHHs was 13.8% as of September 22, 2023. The vacancy rate for unit staff (Human Services Technicians, LPNs, Mental Health Program Assistants, and RNs) across CBHHs was 13.3%, meaning 35.5 positions were unfilled; there was also approximately one unfilled psychiatrist position, which results in a vacancy rate of 16.1% for psychiatrists across the CBHHs.

27. DHS has an obligation to operate within the appropriation it receives from the Legislature. DHS is required by law to have a balanced budget at the end of each biennium. The Legislature can grant an agency specific authority to carry extra funds over to a new biennium, however the Legislature cannot grant an agency the authority to carry over a net deficit.

28. Most DHS funding held by divisions outside of DCT are federal funds or grant funds. Such funds cannot be reached by DCT or used by DHS for other than for their designated purpose.

29. Transferring funds from other divisions of DHS to DCT would first require that those funds be available. In other words, the funds cannot be needed for another existing purpose and cannot be made available by removing an existing purpose, such as laying off DHS staff to make funds available. If there were available funding in other divisions of DHS, that money could then potentially be transferred to DCT, but the transfer requirements described above would still apply. Namely, Minnesota Management & Budget would need to approve the transfer as an appropriate use of the funds and would report this transfer to the Legislature.

30. I am not currently aware of any available funding held by other divisions of DHS that could be transferred to DCT. Even if such funding was available and could be transferred without objection, DCT could not use this funding for construction of new program buildings or expansion or renovation of existing program buildings due to the length of time the funds would need to be available and without the authority to construct the facilities.

31. I am not currently aware of any available funding held by DCT that could be used to construct new program buildings or expand or renovate existing program buildings.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

Executed on September 29, 2023
Anoka County,
State of Minnesota

LYNN GLANCEY